UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT BOWLING GREEN

UNITED STATES OF AMERICA                                            PLAINTIFF

vs.                              CRIMINAL ACTION NO. 1:11-CR-13-R

MOHANAD SHAREEF HAMMADI                                             DEFENDANT

### DEFENDANT'S SENTENCING MEMORANDUM

Comes the defendant, Mohanad Shareef Hammadi (hereinafter "Hammadi" ), by counsel, James A. Earhart, and files his sentencing memorandum in support of the sentence to be imposed in this case, and states as follows:

### SUMMARY OF THE CHARGES

Hammadi is charged in the Superseding Indictment with 5 counts of attempting to provide material support to terrorists, in violation of Title 18, United States Code, Section 2339A (Counts 1, 2, 4, 6, and 8); with 4 counts of attempting to provide material support to a designated foreign terrorist organization (al Qaida in Iraq), in violation of Title 18, United States Code, Section 2339B (Counts 3, 5, 7, and 9); and 1 count of conspiring to knowingly transfer, receive, possess, and export a surface-to-air missile launcher system, in violation of Title 18, United States Code, Section 2332g (Count 10); and 2 counts of knowingly making a false statement in an application required by immigration laws and regulations, in violation of Title 18, United States Code, Section 1546(a) (Counts 11 and 12).

-1-

SUMMARY OF THE FACTS

In or about 2009, the FBI began an investigation involving Waad Ramadan Alwan (hereinafter "Alwan").  It appears that a Confidential Informant (CI) began meeting with Alwan beginning in or about August 2010.  The CI appears to represented to Alwan that he was working with a group to send money and weapons to Iraq.  In or about January 2011, Hammadi was recruited by the CI and Alwan to assist them.  Hammadi was a 23 year old refugee from Iraq who had no access to weapons or money and was unemployed at the time.   His cell phone was disconnected, without money for food, and was behind on his rent.

In or about January 2011, it appears that the CI began pressuring Alwan to recruit Hammadi to assist in scheme.  On or about January 25, 2011, the CI and Alwan met with Hammadi to recruit him into the scheme to ship weapons and money to Iraq.  Hammadi emboldening himself told the CHS about his prior experiences while living in Iraq.  During that meeting the CI told Hammadi about the shipments of money that he and Alwan were sending overseas and offered to pay Hammadi to participate in the plan.  The CI told Hammadi that essentially all he had to do was carry money **supplied by the CI** and weapons **supplied by the CI** from a storage container to load into a truck.

On January 27, 2011, the CI provided Alwan and Hammadi money represented to be $100,000.  The CI took Hammadi and Alwan to a tractor-trailer with a hidden compartment and showed them how to access it.  Alwan and Hammadi at the direction of the CI placed the alleged $100,000 into the hidden compartment and placed $5,000 in the cab of the tractor-trailer for the driver.

On February 16, 2011, the CI supplied a shipment alleged to include two grenade launchers, two machine guns, two cases of C4 plastic explosives, two sniper rifles, and money (five bundles of $100 bills and $5,000 for the driver). On February 15, 2011, Alwan took Hammadi to a storage facility in Bowling Green, Kentucky, to prepare the weapons for delivery the following day. Alwan and Hammadi placed the weapons into duffle bags. On February 16, 2011, the CI supplied Alwan and Hammadi with a surface-to-air missile launcher system to carry from the storage unit and load into the transport truck.

Hammadi was a 23 year old Iraqi national residing in Bowling Green, Kentucky at the time . Hammadi entered the United States on or about July 20, 2009, under a United States refugee program. Count 1 charges Hammadi with attempting to provide material support and resources to terrorists (2339A) on January 27, 2011. The shipment included money. The money purported to be $100,000 in stacks of cash and $5,000 for the driver. On that date the CHS took Hammadi and Alwan to a tractor-trailer with a hidden compartment and showed them how to access it. They then placed what purported to be $100,000 into the hidden compartment. They also placed $5,000 in the cab of the tractor-trailer for the driver.

On March 16, 2011, the shipment supplied by the CI included two Stinger surface-to-air missile launcher systems, and money. On March 15, 2012, the CI met with Hammadi and Alwan to discuss a shipment for the following day. That same day, Alwan and Hammadi at the direction of the CI went to a storage facility in Bowling Green to prepare the Stinger surface-to-air missiles for shipment by placing them in ski bags for delivery the next day. On March 16, 2011, Alwan and Hammadi, at the direction of the CI picked up the two Stinger missile launchers

from the storage facility and delivered them to the tractor-trailer. Alwan and Hammadi loaded them into the trailer and concealing them in hidden compartments in pallets. Hammadi and Alwan also loaded bundles of cash in the trailer and $5,000 in the cab for the driver.

On April 21, 2011, the CI provided one case of C4 plastic explosives, a box containing twelve hand grenades and money. On April 21, 2011, Alwan and Hammadi similarly loaded the weapons into the tractor-trailer.

On May 25, 2011, the CI provided three machine guns, three rocket-propelled grenade launchers, and two cases of C4 plastic explosives. On May 25, 2011, Alwan and Hammadi similarly transported them from the storage unit into the truck. Alwan and Hammadi were arrested by the FBI as they approached the tractor-trailer to load the weapons.

Hammadi is also charged with making false statements with respect to an application required by United States immigration laws. Hammadi immigrated to the United States in 2009. He initially traveled from Iraq to Syria. While in Syria, he applied for refugee status under the U.S. Refugee Admission Program. On March 1, 2009, Hammadi signed a form entitled "Sworn Statement of Refugee Applying for Admission to the United States" (Refugee Application). Hammadi's application was subsequently granted and he later arrived in the United States on or about July 20, 2009.

On December 14, 2010, in Bowling Green, Kentucky, Hammadi completed an Immigration Form I-485, Application to Register Permanent Residence or Adjust Status (Form I 485). It is alleged that the statements on applications were false when made in that Hammadi was formerly associated with the Jaysh al Mujahidin terrorist group in Iraq.

## SUMMARY OF PRESENTENCE REPORT

The Presentence Investigative Report (("PSR") concludes that the Adjusted offense Level is 56, with a total; offense level of 43. Hammadi has 0 criminal history points, however, is found to be a Criminal History category VI by virtue of §3A1.4 (assigns criminal history category VI to all offenses involving "terrorism").

## ARGUMENT

The sentencing guidelines create an advisory sentencing scheme. United States v. Booker, 125 S.Ct. 738, 757 (2005). The sentencing court is required to consider the guideline range, but permits the court to tailor the sentence in light of other statutory concerns as well. Id.. See also, 18 U.S.C. § 3553(a). After Booker, district courts are to consider all of the factors in Section 3553(a), of which the guideline range is just one part. In United States v. Webb 2005 WL 763367 (6th Cir. 2005), the Sixth Circuit stated that "[w]e read Booker as instructing appellate courts in determining the reasonableness to consider not only the length of sentence but also the factors evaluated and the procedure employed by the district court in reaching the sentencing determination. Thus we may conclude that a sentence is unreasonable when the district court fails to "consider" the applicable guideline range of neglects to consider the other factors listed in 18 U.S.C. § 3553(a), and instead simply selects what the judge deems to be the appropriate sentence without such required consideration." Booker, 125 S.Ct. at 757(noting that the sentencing court is "require[d] . . . to consider Guidelines range" but may "tailor the sentence in light of other statutory concerns as well, see § 3553(a).").

The Court went on to explain, that "[w]hile we decline to indicate what weight the district

court must give to the appropriate Guideline range, or any other § 3553(a) factor, we also decline to hold that a sentence within the proper Guideline range is *per se* reasonable. Such a per-se test is not only inconsistent with the meaning of "reasonableness," Crosby 397 F.3d at 115 (noting that reasonableness is "a concept of flexible meaning, generally lacking precise boundaries"), but is also inconsistent withe the Supreme Court's decision in Booker, as such a standard "would effectively reinstated the mandatory adherence of the Guidelines." Crosby 397 F.3d at 115. See also Webb 2005 WL 763367, at n. 9.

The district court judge "must [instead] make an individualized assessment based upon a thorough consideration of all of the § 3553(a) factors. United States v. Bolds, 511 F.3d 568, 580-81 (6th Cir. 2007)(*quoting* Gall v. United States, 552 U.S. 38, 50 (2007). For though the Sentencing Commission "fills an important institutional role" in promulgating the guidelines, the sentencing judge "has greater familiarity with the individual case and the individual defendant before him . . . [and] is therefore in a superior position to find facts and judge their import under § 3553(a) in each particular case." Kimbrough v. United States, 552 U.S. 85, 109 (2007).

The sentencing court is to consider the following:

1. The nature and circumstances of the offense and the history and characteristics of the defendant;

2. The need for the sentence imposed;

3. The kinds of sentences available;

4. The kind of sentence and the range established by the guidelines;

5. Any pertinent policy statements;

6. The need to avoid unwarranted sentencing disparity among defendants with similar records have been found guilty of similar conduct; and

7. The need for restitution.

**OBJECTIONS**

Hammadi was at the time a 23 year old young man who immigrated from Iraq. A country torn by war long before the United States invasion in 2003. Hammadi grew up in constant fear of his life, under marshal law, and faced daily the trauma of confronting armed occupying and domestic forces. Hammadi was trying to attend college when he was forced to flee his own country to Syria where he was placed in a refugee camp. There he was designated by international groups to immigrate from Syria to the United States. He arrived in Nevada where he had no family, little language skills, no employment and little formal education. Unable to find work or even support himself, he migrated to Bowling Green, Kentucky, to work in a poultry factory.

Hammadi became ill and lost that job. His cell phone was terminated, he had no money for food, no money to pay rent, he was recruited by an acquaintance (Alwan) and the government CI to participate in their scheme to ship weapons and money to Iraq. Hammadi had no money or weapons, means of transportation. Hammadi was paid to carry the weapons and money from a storage unit and load them into a transport truck. Hammadi had no role in the selecting or securing of the weapons. In fact, the United States provided millions of dollars of weapons and substantial sums of cash to be loaded by Hammadi.

Quoting from the Florida Center from Investigative Reporting "Trvor Aaronson discussed

the findings of his new book *The Terror Factory: Inside the FBIs Manufactured War on Terrorism* (Ig Publishing, January 2013), which grew out of an award-winning *Mother Jones* cover story, Aaronson analyzed more than 500 federal terrorism prosecutions from 2001 to 2012 and questioned whether U.S. law enforcement is creating the very enemy the nation fears. Aaronson found that the Federal Bureau of Investigation has, "under the guise of engaging in counter terrorism since 9/11, built a network of more than 15,000 informants to infiltrate Muslim communities and ferret out would-be terrorists. The Bureau then provides the means necessary for these would-be terrorists to move forward with a terrorist plot — in some cases even planting specific ideas for attacks."

Few Americans, Aaronson says, realize that since 9/11 the FBI has been responsible for hatching and financing more terrorist plots in the United States than any other group. In the ten years following 9/11, the FBI and the Justice Department indicted and convicted more than 150 people following sting operations involving alleged connections to international terrorism," Aaronson writes. "Few of these defendants had any connection to terrorists, evidence showed, and those who did have connections, however tangential, never had the capacity to launch attacks on their own. In fact, of the more than 150 terrorism sting operation defendants, an FBI informant not only led one of every three terrorist plots, but also provided all the necessary weapons, money, and transportation."

Aaronson reports that through these elaborate and expensive sting operations involving informants and undercover agents posing as terrorists, the FBI has arrested — and the U.S. Justice Department has prosecuted dozens of men who government officials say posed terrorist

-8-

threats. He says evidence suggests, however, that some of those under FBI scrutiny did not have the capacity for terrorism and that FBI undercover agents provided the means, including weapons and logistical support.

Aaronson's other findings in *The Terror Factory* include:

1. In the 10 years following 9/11, the FBI and the U.S. Justice Department indicted more than 150 people following sting operations involving alleged connections to international terrorism. Few of these defendants had any connection to terrorists, publicly available evidence shows, and those who did have connections, however tangential, did not have the capacity to launch attacks on their own.

2. Of these defendants caught up in FBI terrorism sting operations, an FBI informant was the person who led one of every three terrorist plots, and the FBI also provided all of the necessary weapons, money, and transportation.

3. Following a post-9/11 presidential mandate to increase human intelligence gathering, the number of FBI informants swelled to 15,000. The increase in the number of informants was so dramatic that the FBI created a new software package to help track and manage its army of snitches.

4. Some of the FBIs informants have strong financial incentives to find alleged terrorists, with the FBI rewarding them with $100,000 or more per case. Other informants are coerced into cooperating with the FBI for fear of deportation or criminal prosecution, records show.

James J. Wedick, a former FBI agent who supervised undercover work, is quoted as having said that Aaronson "explains just how misguided and often deceptive FBI terrorism sting

operations have become." As counsel explained in <u>United States v. Cromiti</u>, 09-cr-00558, U.S. District Court, Southern District of New York (Manhattan), "The essence of what occurred here is that a government, understandably zealous to protect its citizens from terrorism came upon a man both bigoted and suggestible, one who was incapable of committing an act of terrorism on his own, . . . "[i]t created acts of terrorism out of his fantasies of bravado and bigotry, and then made those fantasies come true."

### Sentencing Entrapment

**1.     Downward Departure:**

Sentencing entrapment and manipulation are not common grounds for downward departures. Such violates the Due Process Clause of the United States Constitution. The courts should not allow the government to continue to engage in conduct which leads to sentence entrapment. This conduct causes five principal harms that cannot be ignored: "(1) circumvention of congressional intent; (2) damage to the image of law enforcement; (3) violation of ethical duties of prosecutors; (4) punishment of the wrong people; and (5) creation of an opportunity for additional abuse."[1]

---

[1] Marcia G. Shein, Sentencing Manipulation and Entrapment, Crim. Just., Fall 1995, at 29. The proposed amendment states:

> Where the government engages in continuing undercover or sting transactions for theprimary purpose of exposing the defendant to a greater potential sentence, then a downward departure may be warranted. This departure will most often apply in cases involving drugs and money laundering where the government through its conduct in the investigation controls the amount or type of drugs, or the value of funds attributable to the defendant. This provision is designed to insure that the executive branch through its law enforcement activities does not impinge on the authority and independence of the judiciary to make sentencing determinations.

Some courts in drug cases have used the application notes in Section 2D1.1 of the Guidelines ' as a statutory basis for a downward departure based on sentencing entrapment or manipulation in drug cases." Application Note Fourteen states:

> If, in a reverse sting (an operation in which a government agent sells or negotiates to sell a controlled substance to a defendant), the court finds that the government agent set a price for the controlled substance that was substantially below the market value of the controlled substance, thereby leading to the defendant's purchase of a significantly greater quantity of the controlled substance than his available resources would have allowed him to purchase except for the artificially low price set by the government agent, a downward departure may be warranted.

See USSG § 2D1.1, cmt. n.14.

Sentencing entrapment is characterized as an outgrowth of the affirmative defense of entrapment. The salient distinction between sentencing entrapment and entrapment is that entrapment is a defense to a crime, while sentencing entrapment merely lowers a defendant's sentence. Many of the same policies support both concepts. The relevant distinction between entrapment and sentencing entrapment lies within the degree of intent. For example, a defendant who raises the defense of entrapment is arguing that he did not have the requisite intent to commit that crime at all; in contrast, a defendant who argues sentencing entrapment is asserting only that he did not have the intent to commit that serious of a crime.

Black's Law Dictionary defines sentencing entrapment as "[e]ntrapment of a defendant who is predisposed to commit a lesser offense but who is unlawfully induced to commit a more serious offense that carries a more severe sentence." See BLACK'S LAW DICTIONARY 554 (7th ed. 1999).

The D.C. Circuit, Eighth Circuit, and Ninth Circuit embrace a subjective approach to

sentencing entrapment.[2] Under a subjective approach, a court must determine whether the defendant had the subjective intent to commit the more serious crime.66 In other words, a court asks whether the defendant had the intent to commit the more serious crime or merely the intent to commit some lesser crime. The First and Tenth Circuits take a different approach and focus on the government's conduct.[3] The objective approach scrutinizes the government's conduct to determine if the government acted in a manner that was so inappropriate as to warrant a downward departure. Downward departures for sentencing entrapment can help curb inappropriate government conduct and "ensure that sentences imposed reflect the defendants' degree of culpability. " United States v. Staufer, 38 F.3d 1103, 1106 (9th Cir. 1994); *accord* United States v. Parrilla, 114 F.3d 124, 127 (9th Cir. 1997). To date the Sixth Circuit has declined to recognize either sentencing doctrine due to failure to find the factual circumstances upon which the defendant would prevail on such a claim. See United States v. Guest, 564 F.3d 777, 781 (6th Cir. 2009) (stating that Sixth Circuit generally does not recognize either sentencing entrapment or sentencing manipulation).

In United States v. Fontes, 415 F.3d 174 (1st Cir. 2005) in a powder versus crack cocaine

---

[2] See United States v. Searcy, 233 F.3d 1096, 1101 (8th Cir. 2000); United States v. Parrilla, 114 F.3d 124, 127 (9th Cir. 1997); United States v. Walls, 70 F.3d 1323, 1329 (D.C. Cir. 1995).

[3] See United States v. Rizzo, 121 F.3d 794, 801 (1st Cir. 1997); United States v. Lacey, 86 F.3d 956, 964 (10th Cir. 1996); United States v. Montoya, 62 F.3d 1, 4 (1st Cir. 1995). Additionally, despite the D.C. Circuit's general endorsement of the subjective approach, a D.C. district judge applied an objective approach to sentencing entrapment but was overturned on appeal for not applying a subjective approach. See United States v. Shepherd, 857 F. Supp. 105, 111(D.D.C. 1994), vacated by 102 F.3d 558 (D.C. Cir. 1996).

case the district court found sentencing manipulation. District court imposed a "non-Guidelines" sentence that was below the recommended Guidelines sentencing range. District court stated that the police conduct was not sufficiently "outrageous" to justify equitable remedy of avoiding the mandatory minimum. The lower sentence was affirmed by 1st Circuit.

This case presents a factual basis squarely within the sentence entrapment defense and should be recognized as an appropriately permissible basis for a downward departure under Guidelines Manual §5K2.0 and 18 U.S.C. § 3553(b). As such it represents "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines . . .," and the Court has the authority to depart from the guidelines and impose a different sentence. The Commission did not adequately consider all aspects of the sentence entrapment defense when it enacted the guidelines. Under either the objective or subjective approach, Hammadi warrants a departure from LIFE to the mandatory minimum sentence of 25 years.

### 2. Avoidance of Mandatory Minimum Sentence

In addition to departing downward the Court should also void the mandatory minimum sentence relative to Count 10 which carries a mandatory minimum sentence of 25 years. Simply, it was the government who introduced this weapon into the scheme without any regard to the activity or conduct of Hammadi - - who carried it from the stage unit to the truck. Hammadi had no access to this type of weapon (source); means to obtain this type of weapon (financial wherewithal); or outlet to distribute such weapon (purchaser). The only reason this weapon was introduced by the government into the scheme was to implicate the mandatory minium sentence

because they were frustrated with courts imposing lower sentences in similar type cases.

See:

United States v. Cannon, 886 F. Supp. 705 (D. N.D. 1995) the district court found sentencing manipulation and sentencing entrapment due to last minute addition of machine gun by police (as opposed to negotiated deal of drugs and hand guns).  District court voided mandatory  minimum for machine guns and sentenced on hand guns and drugs alone. Reversed by 8th Circuit on other grounds and granted D a new trial.

United States v. Williams, 2012 WL 1422897 (9th Cir. Apr. 25, 2012) (drug conspiracy): affirmed district court's finding of sentencing entrapment and avoidance of mandatory minimum.

United States v. Ciszkowski, 492 F.3d 1264, 1270 (11th Cir. 2007): suggested that a court can remove manipulated conduct from sentencing calculus and thereby avoid mandatory minimum.

United States v. Fontes, 415 F.3d 174, 180 (1st Cir. 2005): recognized a court's ability to impose a sentence below the statutory mandatory minimum as an equitable remedy.

In United States v. Riewe, 165 F.3d 727, 729 (9th Cir. 1999): stated that district court could apply the mandatory minimum for a lesser offense as remedy for sentencing manipulation

United States v. Montoya, 62 F.3d 1, 3-4 (1st Cir. 1995) (sentence factor manipulation "applies to statutory minimums as well as to the guidelines")

United States v. Carreiro, 14 F. Supp.2d 196 (D. R.I. 1998): district court finds appropriate remedy to be granting motion for acquittal of § 924© charge because that was the only way to exclude tainted factors. "Ordinarily, the factors improperly inflating the sentence

would be

disregarded and the defendant would be sentenced on the basis of the unadorned offense that he committed." (*support for avoidance of mandatory minimum short of acquittal*)

But See:

United States v. Cromitie, 2011 WL 2693297 (S.D.N.Y. 2011) (terrorism): district court found sentencing manipulation based on government's introduction of missile to offense but ruled that court was bound by mandatory minimum sentence.

## CONCLUSION

Based upon the foregoing Hammadi requests the Court impose a sentence not in excess of 15 years which is sufficient but not greater than necessary under the facts and circumstances of this case.

                                               Respectfully submitted

                                               /s/ James A Earhart
                                               James A. Earhart
                                               2819 Seventh Street Road
                                               Louisville Kentucky 40215
                                               502-365-2436

<u>Certificate of Service</u>

  I hereby certify that a true and accurate copy of this Sentencing Memorandum was sent electronically via ECM/ECF this the <u>23</u>rd day of January, 2013, to:

              <u>/s/ James A Earhart</u>
              James A. Earhart