```
 1                  UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF KENTUCKY
 2                     BOWLING GREEN DIVISION

 3
     UNITED STATES OF AMERICA,    )  Case No. 1:11-CR-00013-R
 4                                )
              Plaintiff,          )
 5                                )
     VS.                          )
 6                                )
     MOHANAD SHAREEF HAMMADI,     )
 7                                )  January 29, 2013
              Defendant.          )  Bowling Green, Kentucky
 8

 9           ****************************************

10                  TRANSCRIPT OF SENTENCING
               BEFORE HONORABLE THOMAS B. RUSSELL
11             UNITED STATES SENIOR DISTRICT JUDGE

12           ****************************************

13   APPEARANCES:
     For United States:      Michael A. Bennett
14                           Bryan R. Calhoun
                             U.S. Attorney's Office
15                           717 West Broadway
                             Louisville, KY 40202
16
                             Lawrence Schneider
17                           U. S. Department of Justice
                             950 Pennsylvania Avenue, NW, Room 2537
18                           Washington, D.C. 20530

19   Interpreter:            Irene Ishoo

20   [Defendant present.]

21
                             Dena Legg, CCR, RMR, CRR
22                           Official Court Reporter
                             221-A U.S. Courthouse
23                           Louisville, KY 40202
                             (502) 625-3778
24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.
```

1   APPEARANCES (CONTINUED):

2   For Defendant:          James A. Earhart
                            2819 Seventh Street Road
3                           Louisville, KY 40215

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Begin proceedings in open court at 2:10 p.m.)

2          THE COURT:  Call the case, please.

3          DEPUTY CLERK:  Criminal Action Number 1:11-CR-13,

4  *United States of America v. Hammadi.*  We're here for a

5  sentencing hearing, Your Honor.

6          THE COURT:  Who's present for the United States?

7          MR. BENNETT:  Good afternoon, Your Honor.  Mike

8  Bennett, Bryan Calhoun, and Larry Schneider for the United

9  States.

10          THE COURT:  For Mr. Hammadi?

11          MR. EARHART:  Your Honor, Jim Earhart on behalf of

12  Mr. Hammadi, who is present, seated at counsel table, and

13  receiving the assistance of the interpreter at this time.

14          THE COURT:  The interpreter has been sworn, and I

15  will -- Mr. Hammadi, if at any time you do not understand what

16  we are saying, please let us know and we will repeat it.

17      Mr. Earhart, have you and your client received and reviewed

18  a copy of the presentence investigation report?

19          MR. EARHART:  We have, Your Honor.

20          THE COURT:  Is there any objection to the

21  calculations?

22          MR. EARHART:  There are no objections to the

23  calculation.

24          THE COURT:  The court finds the presentence

25  investigation report is accurate.  Total offense level, as

1   determined by the guidelines -- although the count will give a

2   57, the guidelines limit it to a 43.  So the total offense level

3   is 43 with a Criminal History Category of VI.

4       Any objection to that finding on behalf of the United

5   States?

6              MR. SCHNEIDER:  No, Your Honor.

7              THE COURT:  On behalf of the defendant?

8              MR. EARHART:  No, Your Honor.

9              THE COURT:  Mr. Earhart, are there matters you wish to

10  bring to the court's attention?

11             MR. EARHART:  There are, Your Honor.  As the court is

12  aware, I have filed with the court a sentencing memorandum --

13             THE COURT:  I have read that.

14             MR. EARHART:  -- on behalf of Mr. Hammadi.  And let me

15  just start out by stating, neither my comments nor anything that

16  Mr. Hammadi says here today is meant to indicate that

17  Mr. Hammadi does not understand that the conduct in this case

18  was wrong.  He does.  It's not meant to shun responsibility for

19  it or diminish it in any way.  However, we do believe there's

20  information the court should have in understanding how this

21  offense came about.

22      The mandatory guidelines, like before, are similar to the

23  mandatory minimums that exist now, and they were put in place

24  simply to bind the court to certain sentences regardless of the

25  facts and circumstances that surround the event.  And I believe

1   in this particular case it particularly illustrates that point.

2       The main -- the mandatory guidelines were abandoned several

3   years ago, as the court notes, to make them advisory because it

4   was felt the court should take into account individual

5   circumstances and fashion a sentence that's appropriate

6   regardless of what the guidelines might calculate the heartland

7   case to be.  The mandatory minimum sentences are the same -- are

8   the same animal.

9       Many cases are similar.  Mr. Hammadi's case is similar to

10  the case you just heard a moment ago with Mr. Alwan, but it is

11  also significantly different -- excuse me -- than Mr. Alwan's

12  case.  Mr. Hammadi, as the court may be aware, and I think the

13  Government's recitation a moment ago it's clear from the fact

14  and circumstances of this case that Mr. Alwan was a target of a

15  federal investigation and understandably why.

16      Mr. Alwan, apparently, was identified as an individual who

17  was involved with activity in Iraq, particularly relative to

18  fingerprints being identified on explosive devices.  By virtue

19  of that and the United States discovering that he was then a

20  resident -- or had acquired residency in the United States --

21  now, how that happened, I don't know.  I assume that he went

22  through the refugee process.  I assume he went through whatever

23  processes there are relative to fingerprints and otherwise --

24  was admitted to the United States, despite the United States'

25  knowledge that he apparently was involved in that activity in

 1    Iraq.

 2        However, once here, he was obviously identified by the FBI

 3    as someone involved in the activity and targeted to be

 4    approached by the confidential informant in this case -- and I

 5    don't think there's any dispute about that -- to find out, I

 6    guess, two things.  One is whether or not he was, in fact, the

 7    person involved in the activity in Iraq and also to determine

 8    whether or not he was continuing that type of activity or was

 9    willing to continue that type of activity here in the United

10    States, and apparently he was.

11        I don't know anything about the confidential informant.

12    Frankly, I know less about him than the court does because the

13    court's probably been privy to information that I don't know.

14    But what I do know is that the confidential informant

15    orchestrated a scheme -- and I don't mean that in a derogatory

16    fashion -- but a scheme whereby the Government would provide

17    weapons, the Government would provide money, the Government

18    would provide a customer, the Government would provide the

19    opportunity, the Government would provide the means, the place,

20    the time, every aspect of the crime of transporting or loading

21    these weapons from a storage unit onto a truck a few feet away.

22        And Mr. Alwan, obviously, was engaged in that activity.  The

23    United States, during its recitation, indicated that as part of

24    that investigation they -- they got Mr. Alwan to go out and try

25    to recruit others.  And how and why he did that is unknown to

1    the Government in terms of they weren't a participant in that,

2    but Mr. Hammadi was ensnared in that activity.

3        And I think the court needs to understand that Mr. Hammadi

4    was a refugee here in the United States.  He was -- he had come

5    in 2009.  I believe he was 21 years old.  He had no family, no

6    resources, and little education.  He came to Nevada and,

7    basically, was unemployed and unable to find employment or

8    support himself and came to Bowling Green, Kentucky, because

9    they -- he had learned that there was work available.

10       He was, in fact, gainfully employed, I believe at the -- a

11   poultry plant here near Bowling Green, where he received minimum

12   wage.  However, due to becoming ill from the -- from the work

13   and the type of things that he did, he was unemployed at the

14   time.

15       He didn't have electricity.  He didn't have a phone.  He

16   didn't have food.  He didn't have money to pay the rent when

17   Mr. Alwan approached him, simply offering him money to help him.

18   And that's how Mr. Hammadi became involved in this particular

19   activity.  And the help was -- Mr. Hammadi didn't even know what

20   the work was.  He just knew he didn't have any money.  He knew

21   he didn't have any means of supporting himself.  He knew he

22   didn't have any way to eat.  He didn't have anywhere to live.

23       The first time he goes -- basically, the sum and substance

24   of Mr. Hammadi's activity is to carry these items from point A

25   to point B a few feet away.  He has -- he has no means of

1    acquiring weapons.  He has no means -- I mean, I assume -- and I

2    don't know, but just from the nature and the description, I

3    assume these things are very expensive.  It isn't something you

4    just go out and buy for $25 or $50.

5        Frankly, to Mr. Hammadi it was irrelevant what it was.  It

6    was irrelevant where it was going.  It was irrelevant what

7    being done with it.  He was similar to a mule in a drug -- in a

8    drug type case saying "unload this, take it from this truck and

9    put it in that truck," and he did.

10       Unfortunately, he continued to do that after learning what

11   the purpose and what the activity was, and for that, he

12   sincerely regrets that and he knows that was wrong.  He should

13   not have continued to have been involved in it, however, he did.

14   And part of that, I think, is understandable by the nature of

15   the relationship he had with Mr. Alwan, as well as the

16   activities of the confidential informant as a recruiter and a

17   person encouraging the activity to continue.

18       Mr. Hammadi was 21 years of age.  He grew up in a country

19   that was, basically, ravished with war since he was 15 years of

20   age.  At age 15 -- excuse me -- at age 15, his city was bombed

21   by the United States and others.  He lived in a city for one

22   year unable to even leave the city, and he's going to describe

23   to you the way it was in that particular world.  I don't think

24   it's something that we really understand.

25       And when you look at that and then you consider that he

1    comes to the United States, and he's broke and he's approached

2    with a -- with something of this nature, to us it seems really

3    extreme.  To him, he will tell you how weapons in Iraq are like

4    a fruit stand in the United States.  It's nothing extreme.

5        He could walk down the street a few blocks and pick up every

6    single item that the United States was supplying in this

7    particular case and no one would even blink an eye.  No one even

8    cared.  In fact, the weapons are left there for them to take,

9    for anyone to take.  And that is kind of the nature and the

10   background of Mr. Hammadi's experiences prior to coming to the

11   United States.

12       The Government wants to characterize Mr. Hammadi as a

13   terrorist.  Understand that Mr. Hammadi -- and I think

14   Mr. Hammadi will relay to the Court that he does not have any

15   ill will against anyone.  He doesn't want anyone to be hurt.  He

16   doesn't want his family hurt.  He doesn't want American troops

17   hurt.  He doesn't want anyone hurt, but understand -- and this

18   -- I know it's not popular to say and it's not meant to

19   denigrate anything about the American troops or otherwise, but

20   we invaded his country.  When the bombs hit houses, they're

21   indiscriminate.  His friends died.  His family died.  And to say

22   that someone that goes through that would have no feelings is

23   really hard to accept.

24       Mr. Hammadi did not intend to be a terrorist.  He doesn't

25   intend to be a terrorist.  He intended to be a young man who was

1    trying to simply get along in life.  In fact, one of the reasons

2    he was trying to get the money was to get married here in the

3    United States at the time.  Obviously, something that's not

4    going to happen now.

5        And I think when the Court looks at the background of how

6    this case came about, I think the Court can look at two things.

7    One is that Mr. Hammadi did not have anything to do with the

8    orchestration of this scheme, that Mr. Hammadi had no means or

9    ability to acquire these weapons, to access these weapons, even

10   know where they were going to in Iraq, to get them to Iraq in

11   any manner.  He was paid to carry the weapons from point A to

12   point B.

13       And Mr. -- and the real critical issue in this case is, when

14   we look at what's been classified as the Stinger missile -- I

15   mean, that's what it all boils down to.  The Stinger missile

16   triggers the 25-year mandatory minimum that's applicable in this

17   case.  Mr. Hammadi had nothing to do with orchestrating the

18   delivery, purchase, distribution, transportation of a Stinger

19   missile.  The Stinger missile was put in that storage unit for

20   the single and sole purpose to trigger the 25-year mandatory

21   minimum.  There's no other reason.

22       And the court will note that it's put in there at the very

23   last transaction, I believe, in this particular case.  I believe

24   it was placed there.  It was carried there.  They talked about

25   that they had said something to Mr. Hammadi about a Stinger

1    missile and they watched a video or something to that effect.

2    Mr. Hammadi said, yes, he's seen a Stinger missile on television

3    is as close as he's ever seen one.  He said it's not something

4    that they'd regularly see in Iraq.  It's not something that they

5    even particularly used in Iraq, but as part of the -- of going

6    along with the scheme, he talked to the confidential informant

7    about it, and he didn't have any problem with it being shipped

8    to Iraq.

9        But in this particular case, I think that's what -- and as I

10   indicated in my sentencing memorandum, that's what triggers the

11   mandatory minimum.  That's what's making this a mandatory

12   minimum case.  You take that out of the equation and it's a case

13   where the court has the discretion to fashion a sentence between

14   zero and life.  Frankly, to me, I don't have a problem with

15   that.  I think the court should be in a position to fashion a

16   sentence from zero to life, whatever the court thinks is

17   appropriate.

18       What I'm suggesting in my sentencing memorandum that is

19   wrong here is that the Government should not be allowed to

20   manipulate and bind the court in this fashion.  Had this been

21   Mr. Hammadi's idea to place this Stinger missile in there, I get

22   it.  All well and good.  If he said, "Look, I need to get a

23   Stinger missile or an air-to-surface ground support system,"

24   something like that, "Can we get that?  Bring it along, do

25   this," I get it.  But when the Government simply can pick and

1    choose whatever it wants to put in there and then trigger

2    mandatory minimums of 25 years relative to an individual because

3    they don't object or they don't stop the Government after this

4    particular activity gets going, I think, is wrong.  It's just

5    that wrong.

6        If the court believes that a sentence of 40 years is

7    appropriate, then so be it.  The court should give him 40 years.

8    But un -- the other side of that is, if the court thinks a

9    sentence of 15 years is appropriate, the court should be able to

10   do that as well.

11       We're prepared here today to present testimony of

12   Mr. Hammadi, which I believe would support the proposition as

13   presented in my sentencing memorandum.  That is two things.  One

14   is the court should depart from the advisory guideline range of

15   life down to at least the mandatory minimum of 25, and that the

16   court has the ability in this case, based on an argument of

17   sentencing entrapment, to depart from the mandatory minimum and

18   give a sentence the court feels is appropriate for the conduct

19   of Mr. Hammadi.

20            THE COURT:  Thank you, sir.  Does the Government wish

21   to speak now or do you wish to wait until after the allocution?

22            MR. SCHNEIDER:  Your Honor, we'll wait until after the

23   allocution.

24            MR. EARHART:  Your Honor, I would call to the stand

25   Mr. Hammadi.

Hammadi - Direct

```
 1              THE COURT:  Yes, sir.

 2         Mr. Hammadi.

 3         I'm wondering if it would be easier if we did it with him

 4    seated where the interpreter could be seated next to him.

 5         Would that be easier for you, ma'am?

 6              THE INTERPRETER:  Yes, sir.

 7              MR. EARHART:  Whatever satisfies the court is fine.

 8              THE COURT:  Yes, sir.  I'm going to let you remain

 9    seated there.

10              THE INTERPRETER:  Thank you.

11              THE COURT:  I just think with the microphones and the

12    earphones and all that we're hooked up to, that might work

13    better.

14         (MOHANAD SHAREEF HAMMADI, sworn.)

15              THE COURT:  He may be seated.

16                        DIRECT EXAMINATION

17    BY MR. EARHART:

18    Q.  Mr. Hammadi, if you would please, state your full name for

19    the record.

20              THE DEFENDANT (in English):  Mohanad Shareef Hammadi.

21    Q.  And how old are you, Mr. --

22    A.  Mohanad --

23    Q.  I'm sorry.  And how old are you, Mr. Hammadi?

24    A.  Mohanad Shareef Hammadi.  25 years of age.

25    Q.  All right.  And, Mr. Hammadi, where were you born?
```

Hammadi - Direct

1    A.   In a very little -- in a very little town, Beiji Salahuddin.

2    Q.   Could you describe to the court the town itself, the size of

3    it.  How many people are we talking about?

4    A.   Very small town.  I believe -- I believe it -- the

5    population didn't exceed 8,000, and it was a very small town.

6    Q.   All right.  So it's a town similar to Bowling Green or

7    smaller?

8    A.   Much less.

9    Q.   All right.  And could you describe to the court your family.

10   How many brothers and sisters do you have?

11   A.   We are five brothers, and seven sisters, and my mother and

12   father.

13   Q.   All right.  So you had five brothers, seven sisters, mother,

14   father, and you all living in the same house?

15   A.   Yes.

16   Q.   And could you describe to the court the -- describe your

17   house to the court.

18   A.   The houses there are different than the houses here.  The

19   house, we had three bedrooms, and living room, and dining

20   room -- the living room, and a dining room, and also a hall, a

21   big hall.

22   Q.   And the 14 of you lived in the three-bedroom house?

23   A.   We were 12.

24   Q.   Twelve.  All right.  And what was the occupation of your

25   mother and father?

1    A.  My mother didn't work, but my father was a driver of a

2    truck.

3    Q.  So he was a truckdriver?

4    A.  Yes.

5    Q.  If you would, describe to the court a little bit about your

6    life prior to 2003.

7              THE INTERPRETER:  2003?

8              MR. EARHART:  2003, prior.  2003.

9              THE INTERPRETER:  Three, okay.

10   A.  I was 3 years of age and there was a -- our country was

11   seized.  And then when I was about 9 years of age, the rockets

12   and the -- and attacks were very close to the place where I was

13   living.  There were many, many rockets, and there were many

14   shelling in that area, in our area.  My life was very normal.

15   All I did was go to school, and then go play football, and then

16   come back, very normal.

17       Until the age of 15, everything was so normal.  Again, I'd

18   go to school and come back and, you know, play football, et

19   cetera.  In 2003, when I was 15 years of age, everything changed

20   completely.

21   Q.  How did it change?

22   A.  In 2003, when I was 15, there were rockets all over.  There

23   were planes all over shelling, and there was a base there.  It

24   was -- it was -- it was a base which was the Iraqi military base

25   and also the weapons, weapons repository.  When they invaded,

Hammadi - Direct

1    all the military, Iraqi military would drill and there was no

2    more military left there.

3    Q.   When you say they invaded, who are you referring to?

4    A.   I am talking about the United States military.

5    Q.   Let me go back.  Prior to 2003, did you walk around on the

6    streets freely?

7    A.   Everything was normal.  I would go out freely.  I would go

8    back home freely and go to -- do everything just normally.

9    Q.   And then after 2003, were you able to walk the streets?

10   A.   After 2003, at the sunset you would not be able to go out.

11   You have -- you had to be at home, just stationed at home.

12        And there were times where we would not be able to leave at

13   all home.  We would have to stay home.

14   Q.   Was there a point in time when your city was actually

15   closed?

16   A.   My city was closed for 40 days -- for 40 days and nights.

17   There was no electricity and they had cut off the influx of food

18   or -- or anything.  No food was permitted to come to be

19   delivered to our city.

20        One week before the 40 days, my family was given $3,000

21   as -- to help them.  That was only one week before the 40 days.

22   Just about a month -- a month ago from today they were given

23   some kind of -- some kind of restitution.  But I also have lost

24   my best friend, who was 16 years of age.

25   Q.   What happened to your friend?

Hammadi - Direct

1    A.  He was cut into pieces due to the shelling from the -- from

2    the planes.

3    Q.  Let me ask you, when the bombs hit your town, could they

4    tell the difference between the good people and the bad people?

5    A.  No.  They shot my -- my uncle in his left -- his left arm/

6    shoulder, and it was like many, many shots.  Then they took him

7    to the hospital.  All they told his family, that that was a

8    mistake and we apologize for it.

9        Again, another relative or close friend, she went to the

10   pharmacy to buy medicine for her son.  She was 65 years of age.

11   They killed her and then the next day they spoke -- they said in

12   the microphones, "Oh, that was a mistake that we did and we

13   apologize."

14       Many people I knew there, they would take them to prison,

15   but then the next day we found out that they were killed and

16   were thrown in the streets.

17       Before 2003, I never saw anybody dead except for those who

18   were elderly or sick.  But then after 2003, I saw people that

19   were dying on the streets, being -- people -- numerous, numerous

20   people being killed and for no reason.  It was just too much to

21   bear.

22   Q.  Mr. Hammadi, in 2003, you were 15 years old?

23           THE DEFENDANT (in English):  Yes.

24   A.  Yes.

25   Q.  All right.  And you continued to live in your city in Iraq

Hammadi - Direct

1   until what age?

2   A.  Until I was 19 years of age.

3   Q.  So you were in high school the entire time?

4   A.  I had already finished high school.

5   Q.  All right.  So you finished.  You were just starting to

6   start college; is that correct?

7   A.  Yes, I did -- actually, I did go to college for three

8   months, but I did not continue.

9   Q.  Could you tell the court why you were unable to continue in

10  college?

11  A.  I don't know how I even finished high school, given the fact

12  that the schools were closed for months sometimes, and sometimes

13  the roads would be -- they would be barricaded, barricaded.  All

14  the streets were barricaded.

15      There came a point where I said, "This is it.  I'm not going

16  to continue school and even to finish high school," but then my

17  father insisted that I continue.

18  Q.  Now, Mr. Hammadi, when you were 15 to 19, were you in the

19  military in any regard?

20          THE DEFENDANT (in English):  No.

21  Q.  Were you a member of --

22  A.  No.

23  Q.  I'm sorry.

24          THE INTERPRETER:  I'm sorry.

25  Q.  Were you the member of any military group or participate in

Hammadi - Direct

1    any military activity?  You have to answer out loud,

2    Mr. Hammadi.

3              THE DEFENDANT (in English):  No.

4    A.  No.

5    Q.  Did there come a point in time where you left Iraq?

6    A.  There were times that they would have some type of a curfew

7    from 12:00 p.m. to next day morning and -- but then they had to

8    issue us an ID card that said we are able to go from one city to

9    another city.  And I -- therefore, it was very difficult for me

10   to even attend college.

11       The city was closed.  There was only one door and that door,

12   it would necessitate for me, if I wanted to go out of that door,

13   I would have to go a long way around until I got to that door.

14   Besides, at that door, there was a checkpoint and without the

15   ID, you wouldn't be able to go out, do anything anywhere.  And

16   not only that, but they would -- visitors or relatives that

17   wanted to visit us, they wouldn't come and -- be able to come

18   and visit us without having an ID.

19       They would -- you could not even say one word.  Where you

20   would say one word, they'd take it differently.  There were

21   people innocent that they have taken and thrown in the jail for

22   no reason.

23   Q.  Mr. Hammadi, if you would also, after 2003, how -- or how

24   common were weapons on the street of your city?

25   A.  Before 2003, it was not normal to have weapons on the

Hammadi - Direct

1    streets, and those who had weapons were only the police and the

2    military people.

3        But after 2003, after we were invaded, all the stores were

4    full of arms and weapons.  And I would see -- I was young and

5    all these trucks would be full of weapons.  And they would be

6    carrying them from one place to another.  In fact, even the

7    aircrafts that were cut into pieces and to be sent somewhere.

8        There's so many weapons and -- all over and you would go

9    from starting from very little weapon to the high-grade weapon

10   all the way until you reach an airplane.  And they was so

11   available that you could buy one weapon for $15.

12       One thing I didn't understand, why they had all those --

13   that -- those weapons scattered all over and so available for

14   people to pick up and use.  That I did not understand.  Why

15   didn't they close the city and not have any of those weapons be

16   available there?

17       With the military -- Iraqi military had the weapons, they --

18   they gave it to us.  They just left those weapons there and they

19   just left some and went somewhere else.  And why in the world

20   did they not take those weapons or do something with those

21   weapons?

22       One of my friends was killed -- one of my friends was killed

23   and --

24            THE INTERPRETER:  I'm sorry?

25   A.   I knew someone who was not combatting anyone before 2003,

Hammadi - Direct

1    but then after 2003, he started to be in a sort of -- you know,

2    fighting and combatting.

3    Q.  Mr. Hammadi, let me focus you a little bit.  Did there come

4    a point in time when you went to Syria?

5    A.  I left -- I left to Syria because the area was all so -- it

6    was -- it was so violent.  Everything was so scary.

7        All the people -- all the people were thinking of at that

8    time was just to be -- the safety of their -- their families,

9    their children, and nothing more than that.

10   Q.  How long were you in Syria?

11   A.  Approximately one year.

12   Q.  All right.  And while you were in Syria, did you try to

13   immigrate into the United States?

14   A.  When I went to -- well, because of all the violence that was

15   there in my city -- and I had not -- actually never thought in

16   my life that I would leave my city.  But then I went to Syria

17   and in Syria I was not able to tolerate it anymore.  I was very

18   down and I didn't even -- as much as I liked to play football, I

19   wasn't able to play football.

20       When I went to Syria, I saw a totally different environment

21   where it was -- it was so different than -- than the -- where I

22   was living, where there was so much fear, and violence, and

23   killing, and that was so much different.  It was a life -- a

24   normal life there.

25   Q.  Tell us how you came to come to the United States.

Hammadi - Direct

1    A.   In order to go to Syria, you would have had to make -- make

2    a request or apply through the United Nations to get into Syria.

3    You would have -- if you were to enter Syria, you would have

4    only one month to live there unless if you had a permit, a

5    residency permit, from the government or from the United

6    Nations.

7         When I went to apply at the time to get out of Syria, the

8    quarters were only for the Christians to leave Syria and, you

9    know, go to another country.  All I needed was -- all I needed

10   was that I would have some kind of a permit from the United

11   Nations so that I could reside in Syria.

12        I never intended to go anywhere but back to my country.  I

13   never had any thoughts of leaving my country.  And people, you

14   know, whenever you went back, they would be asking you, you

15   know, "Where are you going?" or "What did you do?"  "How did you

16   do that," et cetera.

17        To really reside there or to have, you know, a residency,

18   you would have to -- every three months to renew your stay in

19   Syria.

20             MR. SCHNEIDER:  Judge, I'm going to have to object at

21   this point.  I don't see any of this testimony as relevant to

22   any of the sentencing factors, any of the crimes charged.  I

23   really don't know what the basis of the questioning here is

24   about Syria.  He's pled guilty to 12 charges in the indictment

25   and he's going off on tangents about what he was doing in Syria,

Hammadi - Direct

```
 1   which I don't see as anything relevant to a sentencing factor.

 2              THE COURT:  I'm going to overrule the objection.  You

 3   may continue.

 4              MR. EARHART:  Thank you.

 5   Q.  Mr. Hammadi, did there come a point in time when they came

 6   to you with paperwork to immigrate to the United States?

 7              THE INTERPRETER:  Your Honor, I have one verification

 8   to make.  That's of the name he mentioned of an organization,

 9   but I didn't get what he said.

10              THE COURT:  Okay.

11   A.  So, yeah -- so that I was -- at home I received a letter

12   from the United Nations organization offering me if I wanted to

13   go to the United States.  And of course, many, many times I

14   hesitated to sign because I really didn't want to come to the

15   United States.  I want to go back to my country.

16       Then they actually told me whether -- you know, you would

17   have to decide one way or the other, and then finally I did

18   sign.  Because a lot of people who had come to the United States

19   and stayed for a short while, they went back -- came back home,

20   and they -- they had indicated that it was difficult, life here,

21   totally different than our country.  The language is difficult.

22   Everything is different and even jobs are difficult to obtain.

23   Q.  Mr. Hammadi, did you -- did you, in fact, come to -- did you

24   fly to the United States to Las Vegas?  Is that how you got

25   there?
```

Hammadi - Direct

1   A.   I actually landed in New York, but I was told that my

2   residency or my place to live would be in Las Vegas.

3   Q.   And, Mr. Hammadi, did you know anybody in Las Vegas?

4   A.   No.

5   Q.   And could you tell the court, when you immigrated to the

6   United States, what did you have -- how much money did you have?

7   A.   I had only $900.

8   Q.   And how many suitcases did you come to the United States

9   with?

10  A.   Just a very -- carry-on bag.

11  Q.   So you had a carry-on bag when you came to the United

12  States?

13  A.   Yes, yes, very small bag.

14  Q.   $900?

15  A.   Yes.

16  Q.   Did you speak English?

17  A.   No.

18          MR. EARHART:   You have to answer out loud.

19  Q.   Did you have a job?

20  A.   No.

21  Q.   Was there anyone helping you when you got to Las Vegas

22  with -- with living?

23  A.   When I arrived there, there was an organization, and I

24  believe it's called the Catholic Charities Organization.

25      Okay.   That assistance was only for three months to six

Hammadi - Direct

1    months, and then only for electricity, and rent, and some food

2    stamps.  And you were to sign a declaration that they were not

3    responsible for you after six months.

4    Q.  Were you able to find work in Las Vegas?

5    A.  No.

6    Q.  All right.  And tell us how you -- how you came to be in

7    Bowling Green, Kentucky.

8    A.  All the people I knew, they were just saying that, if you

9    were to leave, you find work, you would have to go elsewhere in

10   the United States to find work.

11       So, actually, I did not want to stay in Las Vegas.  I really

12   wanted to go back to my country.  But then when I knew that

13   there was a paucity of jobs in Las Vegas, at that point, Alwan

14   told me that if you really want to work, find work, you would

15   have to come here to where I am.  And this is the only place

16   where you would find work and that would be a poultry company or

17   manufacturing company.

18   Q.  Did you, in fact, come to Bowling Green, Kentucky from Las

19   Vegas?

20   A.  Yes, yes.

21   Q.  If you would, tell the court how you first met Alwan.

22   A.  Actually, I didn't know him, but I know of his family

23   because in such a little town, everybody knows everybody.  But

24   then when I move to Syria, I had seen him a couple of times

25   there in Syria.

Hammadi - Direct

1    And, of course, he had preceded me in being here in the

2    United States.  So when I came to the United States -- and then

3    when I was -- I gave up on finding a job in Las Vegas, I thought

4    of calling him and -- because he's the only person I knew here

5    in the U.S.

6    And, really, it was -- he told me the only place where you

7    would find work would be this poultry company and -- but then he

8    also said, "Your work environment is really very bad in that

9    it's not heated.  It's cold," et cetera.

10   Q.  Did you, in fact, get a job here in Bowling Green?

11   A.  Yes.

12   Q.  Tell the court where you worked.

13   A.  When I came here to Bowling Green, there was an

14   organization, something like international, and they offered me

15   a job for three months.  And it was at one --

16          THE INTERPRETER:  I'm sorry.  There's an objection to

17   my interpretation.

18   A.  This organization, if you were to stay three months there --

19   here in Bowling Green, they would find you a job.  And, of

20   course, they would -- this poultry company, but then they

21   offered me a job at -- at --

22          THE INTERPRETER:  It's slipping my mind.

23   A.  -- Ruiz [phonetic], Ruiz [phonetic] --

24          THE INTERPRETER:  I'm sorry.

25   A.  -- furniture, furniture.

Hammadi - Direct

1    I stayed there for nine months but then the salary was very

2    small, very little.  And many people were leaving their jobs

3    there because every other week they were laid off.  And then

4    they would go back again working and then laid off again.

5    Q.  Did there come a point in time where you lost your job at

6    the poultry factory?

7         THE DEFENDANT (in English):  Yeah, I lost --

8    A.  Yes, there was a point where I lost my job because I became

9    sick and I was sick to my stomach.

10   Q.  If you would, tell the court how you became involved with

11   this movement of these weapons with Mr. Alwan.  How did that

12   come about?

13   A.  He told me that I would just have to help him and then --

14   you know, he knew that I needed the money.  And he said that "I

15   would help you financially if you were to help me."  He came --

16   he approached me three -- two or three times, and I had rejected

17   to help him.

18       At that point I was really, really indigent.  I had already

19   started borrowing money.  I had borrowed money from Alwan, $900,

20   and another person I had already borrowed $2,300.

21   Q.  So did -- you had borrowed money from Mr. Alwan?

22   A.  Yes.

23   Q.  And was your electricity on at the time?

24   A.  At that point I already didn't have any electricity.  I did

25   not have internet.  I had only $15 on me.  Even my phone was

Hammadi - Direct

1    also disconnected.

2    Q.  Did you agree to help him?

3    A.  Yes, because he said he would help me.

4    Q.  What did you agree to do for Mr. Alwan?

5    A.  First, he said that he -- I was going to help him and then

6    after that he said that there's stuff that needed to be

7    transferred from one place to another.

8    Q.  Did you know what those things were?

9    A.  When I went to the site, yes, I saw what was there.

10   Q.  And did you in fact, after seeing what was there, help him

11   move those items?

12   A.  Yes.

13   Q.  Why?

14   A.  Because where I came from, it was so normal.  I would be

15   seeing -- seeing all what I saw all over everywhere.  It was,

16   you know, like something normal.

17   Q.  And did he pay you to do this?

18   A.  Yes, he paid me one time.

19   Q.  And let me ask you, at the time you were involved with this,

20   did you have access to any weapons of your own?

21          THE DEFENDANT (in English):  No.

22   A.  No.

23   Q.  Did you have any money to send to Iraq?

24   A.  No.

25   Q.  Did you have any plans of sending weapons or money to Iraq?

Hammadi - Direct

1    A.   No.

2    Q.   And did you do this for any other reason than you were broke

3    and had no money?

4    A.   No, because if I really wanted all that stuff, it was so

5    available back home and, you know, money, arms, weapons,

6    everything was available.

7    Q.   Let's talk specifically about -- when I say the Stinger

8    missile, you know what I'm referring to; right?

9    A.   Yes, you -- yes, you have already explained it to me.  I

10   also read it -- he read it to me.

11   Q.   Had you ever seen a Stinger missile prior to here in Bowling

12   Green?

13   A.   Even there where I was, where it was -- we were at war

14   there, I did not see it there, but I had seen it in the -- on

15   the television.

16   Q.   So you had seen one on television before?

17   A.   Yes.

18   Q.   Did you tell Alwan or the confidential informant that you

19   wanted a Stinger missile?

20        THE DEFENDANT (in English):  No.

21   A.   No, they offered it.  I didn't tell them I wanted it.

22   Q.   Did you know anyone in Iraq who wanted a Stinger missile?

23   A.   They are not in need there for any weapons.  If they needed

24   weapons, it's available there.

25   Q.   All right.  Did you have any contacts in Iraq that you were

Hammadi - Cross

1    sending weapons or money to?

2    A.   For sure I didn't and had I had any plans to send any

3    weapons back there, back home, I wouldn't have accepted to enter

4    a plea agreement.

5              MR. EARHART:  Your Honor, I believe that's all

6    the questions I have for Mr. Hammadi at this time.

7              THE COURT:  You may ask.

8              MR. SCHNEIDER:  Your Honor, we'll try to be much more

9    brief and to the point.  I'll only ask Mr. Hammadi a few

10   questions.

11                        CROSS-EXAMINATION

12   BY MR. SCHNEIDER:

13   Q.   First, Mr. Hammadi, you pled guilty in August of last year;

14   is that correct?  You pled guilty to the entire indictment in

15   this case?

16   A.   Yes.

17   Q.   And you did that because you were, in fact, guilty of every

18   single charge in the indictment; isn't that correct?

19   A.   Yes, yes.

20   Q.   So in regards to the immigration charges, you did lie on

21   your immigration forms and you left out the fact that you were a

22   member of a terrorist group; isn't that correct?

23   A.   Yes.

24   Q.   And in regard to the --

25              MR. EARHART:  I don't think he finished his answer

1  yet.

2           MR. SCHNEIDER:  Okay.  Sorry.

3           MR. EARHART:  Go ahead.

4  A.  Because this is what you want to hear.

5  Q.  No, I'm asking you a question, Mr. Hammadi, and this is a

6  question that's relevant to your entire sentencing.  You pled

7  guilty because you were, in fact, guilty of all of those

8  charges; isn't that correct?

9  A.  Yes.

10  Q.  That includes the immigration charge and the material

11  support charges for the weapons and the Stinger missile

12  launchers; isn't that correct?

13  A.  Yes.

14  Q.  And while you were meeting with the source in this case, you

15  told the source on repeated occasions that you had participated

16  in IED attacks in Iraq.  Isn't that true that that's what you

17  told the source?

18  A.  Whatever I mentioned to the confidential source, it was just

19  a talk.

20  Q.  It was just a what?

21  A.  It was just a talk and not all of it was true.

22  Q.  So you're saying that some of the information that you told

23  the source was lies?

24  A.  It was just a talk and that was -- that was a talk, but if I

25  were to ask you how many people in my country, in my town, were

Hammadi - Cross

1    killed, who was responsible for those killings?

2    Q.   Mr. Hammadi, you're facing a life sentence today.  You don't

3    get to ask the questions.  I'm going to ask you the questions;

4    okay?

5        You're under oath here in the courtroom today before Judge

6    Russell.  Are you lying today about your involvement in

7    terrorist attacks in Iraq or did you lie back then?

8    A.   No, I don't.

9    Q.   You don't what?  Did you lie today or did you lie back then,

10   because your story is different.

11           THE INTERPRETER:  I'm sorry.  I didn't -- Your Honor,

12   I did not understand.  It was mumbled so I need to verify that.

13   Thank you.

14   A.   Probably I was engaged in some of those activities but not

15   the way you perceive me.

16   Q.   So your -- your statements that you engaged in those IED

17   attacks on U.S. troops, that is true; isn't that correct?

18   A.   They were true.

19   Q.   Okay.  And you told the same information about how you

20   participated in IED attacks to the FBI after you were arrested;

21   isn't that true?

22   A.   Yes.

23   Q.   And I'm going to just ask a few more questions.  With regard

24   to you being paid in this case, you were only paid on one

25   occasion; is that correct?

1    A.  Yes, but they promised me that anything I wanted in the

2    future -- I would be given money and there were more promises

3    made.

4    Q.  Were those promises made by the source or by Mr. Alwan?

5    A.  It was Alwan.

6    Q.  Okay.  So it wasn't by the FBI source who was employed by

7    the Government, was it?

8    A.  It was -- he told me that they had told him, they had told

9    him that they would be giving me money.

10   Q.  And you were only paid $750 total for the four months that

11   you participated in these operations; isn't that correct?

12   A.  Yes, they would -- but he would tell me, you know, "just be

13   patient because, you know, they will be getting you more money

14   so be patient."

15   Q.  And that payment of 750, the only money that was paid to

16   you, was paid in late April and not in January when you first

17   started these operations; isn't that correct?

18   A.  I don't remember precisely, but it may be true.

19   Q.  Okay.  Now, you handled the Stinger missile launchers in

20   this case.  You know them by another name, their Russian name,

21   isn't that correct, the Russian name of Strelas?

22           THE INTERPRETER:  S-T-R-E --

23           MR. SCHNEIDER:  Strela, S-T-R-E-L-A.

24           THE INTERPRETER:  Strela, okay.

25   A.  The way I know it is that during the war in Afghanistan,

Hammadi - Cross

```
 1   between the United States Government and Russia --
 2            THE INTERPRETER:  What?  That's what I said, the
 3   Russians.
 4        I'm sorry.  Your Honor, I need to verify something.
 5            THE COURT:  Yes, ma'am.
 6   A.  When there was the war in Afghanistan and it was between
 7   Afghanistan and Russia, the United States would give the
 8   terrorists, Afghani terrorists, this Strela so that they would
 9   fight with it, fight the Russians.
10   Q.  So your answer is that you know that a Strela is a missile
11   launcher.  Is that a yes or a no?
12   A.  I know but I had not seen it in my life.  All I know, that
13   it was on the TV.
14   Q.  Okay.  So on February 16th, you had a recorded conversation
15   with the source in this case.  And you have been given the
16   transcripts and recordings of these over a year and a half ago.
17        On that date, you asked the source, "Why don't they bring
18   Strelas?"  And then you told the source that your --
19            MR. EARHART:  He needs to wait for the answer, if it's
20   a question.
21            MR. SCHNEIDER:  This is continuing the question.
22            MR. EARHART:  Well, let him answer the first one
23   before you continue.
24            MR. SCHNEIDER:  I haven't finished my question yet.
25            THE COURT:  It's a long question.  Why don't you ask
```

1    it in pieces.

2            MR. SCHNEIDER:  I'm just reading this piece that this

3    is the conversation that occurred.

4    Q.  You told him, "Why didn't -- why don't they bring Strelas?"

5    And then you went on to explain that your group in Iraq had 11

6    of them, that you had buried them, or the group had buried them

7    underground, and that they were damaged by water.  Do you

8    remember that conversation?

9            THE INTERPRETER:  I'm sorry.  Your Honor, I need him

10   to repeat his mumbling.

11           THE COURT:  You may ask him, ask him to repeat.

12   A.  He's the one who told me that they would bring this kind of

13   weapons because these weapons are not -- I've never seen it in

14   Iraq and we do not have it in Iraq.

15       I have never seen it, never heard of it in Iraq.  And if

16   there were 11 of them there, then that was 11 -- some of those

17   11 must have been used by the Iraqis.

18   Q.  So is that not your voice on the transcript?

19   A.  This was a hearsay.  I heard it from someone else and -- he

20   was the one who was really bringing up the topic of Strela.

21   Q.  The transcript says that you stated the following -- I

22   quote -- "We had 11 of them, but water got to them."  Are you

23   saying right now that you did not say that and that this

24   transcript is not accurate?

25   A.  I did not say -- I didn't say it, but I -- what I said was I

1    had heard someone else say it.  It was a hearsay on my part.

2    Q.  That's not what you said.  Would you like to see the

3    transcript and have the interpreter read it back to you or --

4    you've had this transcript and your lawyer has had it for a year

5    and a half.

6    A.  I know I said that, but the fact is what I'm telling you

7    now.  This may not change anything, have no effect and any

8    bearing on what my sentencing would be, but that is the fact and

9    that's what I'm saying now.

10   Q.  Are you lying right now in court or did you lie back then

11   when you told that to the source?

12          MR. EARHART:  Your Honor, I'm going to object to the

13   lying questions.  He asked him a question.  He answered.  He

14   explained it and it's not a matter of lying then or lying now.

15   He said he embellished it back then and he's explaining what his

16   source was.  Neither one is a lie.

17          MR. SCHNEIDER:  That's not an embellishment, Your

18   Honor.

19          THE COURT:  Well, that's a matter of interpretation.

20   Why don't you just rephrase your question.

21          MR. SCHNEIDER:  Judge, I -- if I can have one second.

22      I just have one final question, Your Honor.

23   Q.  Isn't it true, Mr. Hammadi, that when you first met with the

24   source in this case -- this was late January of 2011 -- that you

25   were still employed by Perdue when you started these operations?

1    A.  It was -- it was just -- just before I had already got --

2    just before I was losing my job.  I believe so, yes, because I

3    got very sick then.  I was very sick.  As I was doing -- when I

4    was on the job, I was sick to my stomach.

5            THE INTERPRETER:  Yes, but -- excuse me, Your Honor.

6    He's correcting my English and saying "sick to my stomach," but

7    I -- that is what it is, that I was throwing up and I was --

8    okay.

9            MR. SCHNEIDER:  The Government has no further

10   questions of Mr. Hammadi, Your Honor.

11           THE COURT:  Thank you.

12      Any redirect?

13           MR. EARHART:  No, sir.  Thank you.

14           THE COURT:  Any other witnesses?

15           MR. EARHART:  No, sir.  Mr. Hammadi may --

16           THE INTERPRETER:  Your Honor, can I have just one

17   second?  I ordered the shuttle to take me and --

18           THE COURT:  I'm sorry, ma'am.  Let me hear you.

19           (The interpreter conferring with the Court off the

20   record.)

21           THE COURT:  Let's take a five-minute break.  The

22   interpreter needs a little break.  She has to make a call

23   because she has someone picking her up.

24      You can also let me know, when we return, if you wish to

25   make any allocution, other than what he's already made, when we

1    return.

2          MR. EARHART:  I think that's principally it, Your

3    Honor, yes, sir.  Thank you.

4          THE COURT:  We'll take about five minutes.

5          (At this point a recess was taken.)

6          THE COURT:  I'll be happy to hear any closing remarks

7    counsel may have.

8          MR. SCHNEIDER:  Thank you, Your Honor.  In this case,

9    with respect to the Defendant, Mohanad Hammadi, his relevant

10   offense conduct is identical to his co-defendant's relevant

11   offense conduct, Waad Ramadan Alwan, his co-defendant.

12       Looking at, first, the presentence report in this case, both

13   the Government and the defense have no objections to the facts

14   or the guideline range, the guideline range being life in this

15   case, with a total offense level of 43 and a Criminal History

16   Category of VI.

17       The Government agrees with and recommends a sentence of life

18   imprisonment, and is not moving for any type of reduction or

19   departure, and opposes any type of reduction or departure with

20   regards to the sentencing of Mr. Hammadi.

21       The next point to analyze in coming to a sentence for

22   Mr. Hammadi are the sentencing factors under 18 U.S. Code

23   Section 3553(a).  Now, I note that the sentencing factors are

24   mentioned in the defendant's sentencing memo filed with the

25   court, but they are not analyzed.  And I would submit that

1    they're not analyzed in the sentencing memo of the defense

2    because there are no factors in 3553(a) that weigh in favor of

3    anything other than the guideline sentence.

4        The Government will, however, address all of the 3553

5    factors with regard to Mr. Hammadi.  The first being the nature

6    and circumstances of the offense and the history and

7    characteristics of this defendant.  Like Mr. Alwan, Mr. Hammadi

8    was involved in terrorist activity in Iraq.  He then came to the

9    United States, in his cause, through fraudulent means in the

10   immigration process.  And in Mr. Hammadi's case, there were two

11   charges that were added on in the superseding indictment

12   charging him with that immigration fraud conduct.

13       Finally, once he got to the United States, he became

14   involved in the operation in the United States in which he

15   believed that he was helping to send money and weapons to

16   terrorists attacking U.S. troops in Iraq.

17       The superseding indictment against this defendant charges

18   him with ten terrorism crimes and two immigration fraud crimes,

19   and this defendant has pled guilty to the entire indictment.

20       Most significantly, by his own admission, he was a member of

21   a terrorist cell in Iraq and participated in IED attacks against

22   U.S. troops before coming to the United States.  That was

23   detailed in his conversations which were recorded with the

24   confidential human source employed by the FBI in this case.  On

25   numerous occasions he detailed the IED attacks that he

1    participated in in Iraq.

2        He further gave detailed admissions to the FBI after his

3    arrest in this case, after he waived Miranda, in which he

4    described his participation in IED attacks on U.S. troops and

5    his membership in terrorist cells in Iraq.

6        And, finally, today here in open court, when he chose to

7    testify, on cross-examination he admitted that his participation

8    and his statements about participating in those IED attacks was

9    true.

10        After participating in IED attacks against U.S. troops in

11    Iraq, he then lied on his immigration forms to obtain refugee

12    status to not only enter the United States but to also seek

13    financial aid and benefits from the U. S. Government.

14        While here in the United States, he was recruited to the

15    ongoing material support operation being conducted with the FBI

16    source by his friend and co-defendant, Waad Ramadan Alwan.  It's

17    important to note that he was not chosen randomly by the FBI.

18    Instead, the FBI source told Mr. Alwan that if he wanted to be

19    the head of a Kentucky-based terrorist cell, he would have to

20    recruit other members and that he could be the leader.

21        Mr. Alwan, as I explained earlier in the Alwan sentencing

22    proceeding, attempted to recruit a number of individuals.  Two

23    individuals he attempted to recruit because he believed that

24    they espoused anti-American views and that they were extremists.

25    He had no further information about their background.  Those

1    individuals met with the source and declined to participate in

2    this operation, something that Mr. Hammadi did not do.  He never

3    declined to participate in this operation.

4        Instead, Mr. Alwan vouched for Hammadi to the source in this

5    case, telling the source that he knew Hammadi from Iraq, that he

6    was worth his weight in gold, and that he was experienced as a

7    former fighter and insurgent in Iraq.  That is the first

8    knowledge that the source had of who Hammadi was and what he was

9    all about.

10        When they first met, Hammadi met with the source January

11   25th of 2011.  That was the first meeting.  And in that first

12   meeting, they had discussions about what Alwan and the source

13   had been doing for the previous several months in terms of

14   delivering weapons and money.

15        At first the source only described the fact that they were

16   sending money to the Mujahidin in Iraq, the Mujahidin being the

17   umbrella term for the insurgents and fighters attacking U.S.

18   troops.  The source explained that they were doing these

19   operations and he was offering for Mr. Hammadi to participate.

20   No money was offered by the source to Mr. Hammadi to

21   participate.  There are no discussions at all in the recordings

22   or in the transcripts where the source ever offered money, nor

23   did they discuss it in any of the transcripts.

24        Mr. Hammadi agreed to participate and even stated that the

25   important thing was the goal, meaning providing the insurgents

in Iraq with support.  He went on to state in that first
meeting, the first time he ever met with the source, that if
they were sending money, maybe they can send it in smaller
amounts over time so that there would be less risk of seizure of
that money, leading into his statement of the important thing
being the goal to support the Mujahidin in Iraq.

The first meeting was on January 25th.  The first time that
Mr. Hammadi participated in a delivery was two days later on
January 27th, where he believed a delivery of money was being
shipped in a car that would go to Iraq.  He participated with
Mr. Alwan and he said it was easy, commenting on the fact that
it was easy to load the money into hidden compartments that
would be sent overseas to support the terrorists in Iraq.

The second delivery was just a few weeks later on February
16th, and that was a weapons shipment.  Prior to the delivery of
the weapons, the source met with Mr. Hammadi and Alwan and told
Mr. Hammadi that he wanted to make sure that Hammadi knew that
the weapons were not only going to the Mujahidin in Iraq, they
were also going to al-Qaida.  That put Mr. Hammadi on notice
prior to delivering the weapons, if he wanted to back out on
February 16th, he could have.  But instead, after learning that
the weapons and the money would be going to the Mujahidin and to
elements of al-Qaida in Iraq, he continued eagerly to
participate in the operations.

Also, in February of 2011, during a discussion about

1    shipping weapons, Hammadi said to the source that he wanted to

2    ask the source about sending Strelas.  I quote.  "I wanted to

3    tell you, why don't they bring Strela?"  That's a quote from

4    Mr. Hammadi in the transcript of the recorded conversation with

5    the source on February 16th.

6       The Strela, as we've discussed earlier, is the Russian name

7    for a missile launcher.  In the United States we've referred to

8    them as Stinger missile launchers.  The Russian term is a

9    Strela.

10      Mr. Hammadi went on to state, "It requires a tall guy and

11   big," referring to the size of the missile launcher.  And in

12   that respect, we have three photographs, Your Honor, that we'd

13   like admitted into evidence.  It's Government Exhibits 1, 2, and

14   3, and we've provided Mr. Earhart with copies.  I would like to

15   show the court.

16            THE COURT:  Thank you.

17            (Government Exhibits 1, 2, and 3 admitted in

18   evidence.)

19            MR. SCHNEIDER:  Government's Exhibit 1 is a photo

20   taken from the inside of a tractor trailer truck which was used

21   for the purpose of storing the weapons in this case.  In this

22   photo, both Alwan and Hammadi are pictured.  Mr. Alwan is on the

23   right with his arm reaching out onto the missile launcher, and

24   Mr. Hammadi is holding the missile launcher.  This gives an idea

25   of the size of the missile launcher.

1    Once again, going back to the conversation on February 16th,

2    Mr. Hammadi stated, and I quote, "We had 11 of them but water

3    got to them."  The source asks, "How did water get to them?"

4    And Mr. Hammadi replied, quote, "They were buried and...."  That

5    was before there were missile launchers involved as delivery

6    items in the material support operations in this case.  That

7    conversation took place on, I believe, February 16th, Your

8    Honor.

9    That's the second operation that Mr. Hammadi participated

10   in.  It wasn't until a month later, a month after that

11   conversation, on March 16th, that there was a delivery of

12   missile launchers.  So it's absolutely wrong for Mr. Earhart to

13   say that he had no information about missile launchers.  He

14   brought it up a month before they did the operation with missile

15   launchers.  That takes everything out of his argument.

16   Government's Exhibit 2 is another photo of Mr. Hammadi

17   holding a ski bag that contained the missile launcher.  In this

18   case, he participated with Mr. Alwan in picking up the weapons

19   from a storage facility, loading them into bags, driving them to

20   the tractor-trailer truck and then loading them into the

21   tractor-trailer.  So it was operations that took place over, in

22   some cases, two days because they would prepare the weapons on

23   one day in a storage facility and then the next day deliver them

24   to the truck.

25   And then Government's Exhibit 3 is a picture of Mr. Hammadi

1    holding one of the large guns in this case in the storage

2    facility prior to delivery.

3         Now, once again, a month after Mr. Hammadi had a discussion

4    with the source about Strelas, Strelas being missile launchers,

5    the third delivery that Mr. Hammadi participated in occurred on

6    March 16th.  That was when Mr. Hammadi and Mr. Alwan picked up

7    the missile launchers and delivered them to the truck, all the

8    while believing that those missile launchers would be sent to

9    al-Qaida in Iraq and other Mujahidin terrorists groups to be

10   used to attack U.S. and coalition forces.

11        After March 16th, there were also recorded discussions where

12   Mr. Hammadi discussed with the source his use and experience

13   with an explosive mixture he was familiar with, an explosive

14   mixture that involved the use of the ingredient cocoa as part of

15   the mixture, and advised the source that he would try to find

16   out from one of his terrorist associates the exact ratio of

17   ingredients needed to make that explosive.  He explained to the

18   source that his group had used it and that he was familiar with

19   that type of explosive.

20        In a recorded conversation on April 4th, Hammadi discussed

21   his first attack on American troops with the source.  He also

22   discussed IED attacks he was involved in, and he told the source

23   that he was a member of the Jaysh al-Mahdi terrorist group while

24   he was in Iraq prior to coming to the United States.

25        Two weeks later, on April 19th of 2011, in a recorded

conversation with the source, the source brought up a U.S. Army captain who was known to both Mr. Hammadi and Mr. Alwan from the geographical area they came from in Iraq.  Both Alwan and Hammadi had talked about how they hated this Army captain and how their groups had fought against his unit.  When the source had talked about their fictitious group, the source's fictitious group, conducting some type of attack against this U.S. Army captain on United States grounds when the Army captain -- being back in the United States, Mr. Hammadi asked, "What about an execution attempt?"

And then, in further conversations about whether there would be an attack on this Army captain, he stated to the source that any operation should be a big one.  And I quote from the transcript.  This was on April 19th of 2011.  After discussing the potential execution attempt on U.S. soil of this U.S. Army captain, Mr. Hammadi said, "But I see into it that such operations shouldn't be limited to one only."  He then went on to state, "Many things should take place and it should be huge," talking about a potential attack on U.S. soil.

On the discussions previously about the explosive compounds that Mr. Hammadi was going to seek the ingredient for, the source had indicated that their higher-ups in the fictitious terrorist group in the United States were planning to use this in an attack.  And knowing that, Mr. Hammadi assured them that he would try and find out the exact ratio of ingredients.

1          After all of this time, Your Honor, and the activity that

2    I've discussed so far, it's not until April 19th of 2011,

3    several months after he first met the source and participated in

4    the first operation, that he was given the one and only payment

5    of money by the Government in this case.  He was given an amount

6    of $750 by the source.  It was the first and only payment, and

7    it was given to him to help him pay his bills, not as a method

8    of payment so that he would derive a salary from continued

9    deliveries.

10         The following day, in a recorded conversation with the

11   source, Mr. Hammadi discussed working for the Tandheem, the

12   Tandheem being an Arabic word for "The Organization."  And it's

13   known in the Arabic community that when you talk about "The

14   Organization," the organization being in quotes, that you're

15   referring to al-Qaida.  Hammadi went on in this recorded

16   conversation to tell the source that he participated in lots of

17   IED attacks against U.S. troops.

18         The next day was the fourth operation that Mr. Hammadi

19   participated in, which involved a weapons and money delivery on

20   April 21st.

21         The next month was the fifth and final operation and the day

22   that Mr. Hammadi was arrested.  That occurred on May 25th and

23   was also a weapons and money delivery that Mr. Hammadi

24   participated in.

25         After his arrest, he was Mirandized by the FBI.  He waived

1  his Miranda rights and he was interviewed by the FBI in detail.

2  Over the course of various interviews, Mr. Hammadi stated that

3  he was associated with the Jaysh al Mujahidin terrorist group in

4  Iraq, that he was taught how to build and use IEDs in Iraq.  He

5  told of his first attack on U.S. forces in Iraq in 2006, and

6  stated -- stated that it was on a main highway in Iraq, and the

7  IED was placed on the side of the road and covered with sand.

8  He stated that the IED was detonated by a remote device and that

9  Hammadi and his associates targeted a Humvee and multiple

10  trucks.

11     His participation in a second attack came about a month

12  later, and this attack targeted an American convoy in Iraq.

13  Hammadi believes that IED detonated but did minimal damage to

14  the convoy.

15     He discussed participating in a third IED attack in

16  approximately 2007, in the same geographic area, that also

17  targeted an American convoy.  He stated that he participated in

18  approximately five such attacks with his first terrorist cell

19  leader in Iraq.

20     He discussed his participation in the activities that

21  occurred here in the Western District of Kentucky, and he said

22  to the FBI that he participated in those activities in order to

23  support the fight against American troops in Iraq, very

24  different than the testimony he's proffered here today where he

25  stated that he only did it because of money, money that he was

1    only paid $750 over four months of activity.

2        Hammadi admitted that he believed the shipments of money and

3    weapons from Kentucky were going to support al-Qaida in Iraq.

4    He stated that he was familiar with machine guns because he

5    carried them in Iraq.  He advised that his first use of a weapon

6    in Iraq was when he fired on a U.S. soldier in an observation

7    tower in Iraq.

8        He explained that he participated in approximately five IED

9    attacks with his first cell and then participated in another

10   five to six IED attacks on U.S. troops when he switched to a new

11   terrorist cell and a new leader in Iraq.  The new cell leader,

12   according to Mr. Hammadi, brought Hammadi and his associates to

13   be part of al-Qaida.

14       Hammadi stated that he was arrested in Iraq for planting

15   IEDs, and he admitted that one of his goals when he was in Iraq

16   was to kill Americans.

17       Turning to the characteristics of this defendant, Your

18   Honor.  Based on the relevant offense conduct, the admissions,

19   all the evidence in this case, we know that he's a former member

20   of a terrorist cell in Iraq.  He participated in IED attacks on

21   U.S. troops, multiple attacks.  He was arrested in Iraq for this

22   activity, and according to his statement in the presentence

23   report, he apparently paid his way out of jail in Iraq,

24   something that would go to the deterrence factor of the Court's

25   sentence in this case because he cannot pay his way out of a

1    United States court or sentence in this case.

2        He then lied his way into the United States through the

3    refugee process and his immigration paperwork.  And when he was

4    in the United States and able to turn over a new leaf, he was

5    given the chance to assist insurgents and terrorists while on

6    U.S. soil.  He joined that activity.  He believed he was sending

7    weapons and money to al-Qaida.

8        And one important characteristic of the defendant, which I

9    would like to specifically note, is that even during his

10   interview with probation -- and I refer to the presentence

11   report at paragraph 44, Your Honor, he became angry and said

12   that he may hurt people and people would pay.  That's what he

13   said with the probation officer during the taking of this

14   presentence report in this case.

15       So that -- that is also telling that, despite his attacks in

16   Iraq, despite lying his way into the United States, despite

17   being involved in material support activities in the United

18   States, we've heard him today offer no apologies for his

19   activities, only excuses.  And even during the presentence

20   report in this case, in paragraph 44, during the presentence

21   interview Hammadi became angry while discussing the lack of a

22   plea agreement.  He expressed that he had never hurt anyone

23   before, which is inconsistent with his admissions here in court,

24   to the FBI, and to the source that he participated in IED

25   attacks, but that he may some day and that people will pay.  He

1    quickly apologized for becoming angry.

2        I now turn to the need for the sentence imposed in this

3    case.  A sentence of life is the sentence that the Government

4    recommends.  And the need for the sentence is to reflect the

5    seriousness of the offenses, to promote respect for the law,

6    something that did not happen when he was incarcerated for IED

7    activity in Iraq and paid his way out, provide just punishment

8    for his full panoply of criminal offenses and relevant conduct

9    from Iraq through the refugee process to activities in Kentucky;

10   to afford adequate deterrence; and, finally, and based once

11   again on paragraph 44, to protect the public from further crimes

12   of this defendant.  The fact that he would say in the probation

13   interview that he may someday hurt people and that people would

14   pay clearly goes to that sentencing factor.

15       Another 3553 factor is unwanted sentencing disparity, which

16   we submit is not a factor here because this defendant, unlike

17   his co-defendant, the Government is not asking for a reduction.

18   There's been nothing to warrant the Government asking for a

19   reduction.

20       Although both defendants were engaged in actual terrorist

21   activity in Iraq before coming to the United States, they also

22   both participated in the FBI operation here in the Western

23   District of Kentucky believing that they were sending weapons

24   and money overseas.

25       Based on the presentence report facts, the guideline range,

the 3553 factors, Your Honor, the Government submits that the only reasonable sentence and just sentence here is following the guidelines recommendation of life imprisonment.

I would, however, like to, as a last matter, address some of the arguments made -- actually, made by the defense counsel in his sentencing memo.

His main argument in his sentencing memo is not that any of the 3553 factors weigh in the defendant's favor.  As I said, he doesn't address those factors, but he does raise an argument for a downward departure based on something called sentencing entrapment.  And I think the most relevant factor with regard to his argument is that all the cases in the Sixth Circuit do not recognize any defense of sentencing departure.  It is not recognized in the Sixth Circuit, and the Government would cite the following cases: *United States v. Guest*, 2009, Sixth Circuit case; *United States v. Lebreux*, also a 2009, Sixth Circuit case, which states, quote, "We have never recognized the theory of sentencing entrapment." *United States v. Gardner*, Sixth Circuit case from 2007, which states, "However, neither this court, nor the Supreme Court, officially has recognized the theory of sentencing entrapment. *United States v. Coleman,* Sixth Circuit from 1999, and *United States v. Watkins* from 1999, also the Sixth Circuit.

So every Sixth Circuit case, Your Honor, states fairly clearly that that argument advanced by the defendant in this

1    case is not applicable, not recognized in the Sixth Circuit and

2    should be discounted and totally ignored.

3        If there were a Sixth Circuit recognition, there would still

4    not be any evidence to support the defendant's claim.

5    Entrapment by the Supreme Court's own decisions has two

6    elements, inducement and lack of predisposition.  There is not a

7    shred of evidence in this case for either of those to be

8    advanced by the defendant.  Had there been, there might have

9    been a trial in this case.  Instead, I would submit, Your Honor,

10   that this is a textbook example of non-entrapments.

11       As far as the inducement factor, one of the two necessary

12   factors for entrapment, there were no promises or discussions of

13   money made by the Government to Mr. Hammadi to participate.  He

14   says that Mr. Alwan, a fellow criminal, may have told him that,

15   but that was never stated by the Government and in this case

16   only one payment was ever made to the defendant.  That was $750.

17   That's not relevant or reasonable inducement, $750 paid several

18   months later after the defendant has already delivered weapons

19   believing that those weapons and money were being sent to

20   terrorists in Iraq.

21       As stated in his admissions to the FBI, despite what he's

22   tried to offer here as an excuse for his behavior, he admitted

23   to the FBI after his arrest that he participated in these

24   material support operations with the goal of helping al-Qaida in

25   Iraq.  Thus, there can be no inducement in this case.

1    As lacking as it is in inducement, Your Honor, the lack of

2    predisposition is overwhelming, or actually, his predisposition

3    is overwhelming.  In this case, over the course of months, this

4    defendant has had lengthy discussions with the confidential

5    source about his past.  He's talked about his first arrest in

6    Iraq, how he was arrested.  On the first day he met the source,

7    he told of his arrest in Iraq after emplacing IEDs.

8    He was also recruited and vouched for by Mr. Alwan as a

9    fellow insurgent from Iraq and an experienced fighter.  And as

10   we've discussed before, he's made detailed admissions to the FBI

11   about his past, that past including his participation in IED

12   attacks and his admission and membership in terrorist groups.

13   With that in his past and his admission that those are true,

14   there can be no lack of predisposition.  He was certainly

15   predisposed to help terrorists.  He is a former terrorist

16   himself.  So there can be no way that there can be a valid

17   argument that he was not predisposed to conducting these

18   activities to help his fellow terrorists in Iraq.

19   And also going along with the predisposition argument is the

20   fact that Mr. Alwan tried to recruit others.  When they declined

21   to participate in these operations, that was the end of the

22   inquiry.  Mr. Hammadi never declined to participate.  Instead,

23   he was an eager participant in these and that's why there is no

24   predis -- there is certainly an overwhelming level of

25   predisposition.  There was no inducement.  So even if the Sixth

1    Circuit had recognized this, which it doesn't, there could be no

2    sentencing entrapment or no valid basis for a sentencing

3    reduction as argued by the defense.

4        And quickly, Your Honor, just to recap, when he testified

5    here today in cross-examination, Mr. Hammadi admitted that his

6    statements about his prior terrorist activity in Iraq were true.

7    He admitted that he knew what Strelas were and that Strelas were

8    missile launchers.  He admitted that the source in this case did

9    not discuss money with him and that the discussions, if any at

10   all, came from Mr. Alwan.  He admitted that there was only one

11   payment of $750, which came months after he was already involved

12   and participation in this case, and he admitted that he was

13   still working at the Perdue plant and had a job when he started

14   the material support operations in Kentucky.

15       Although Mr. Earhart has tried to phrase the fact that he --

16   Mr. Hammadi just arrived in the United States, he didn't just

17   arrive in the United States, Your Honor.  He fled Iraq because

18   he was wanted as a terrorist for IED activity.  That's why he

19   left Iraq.  He had been arrested previously there and he

20   believed that he might still be wanted.

21       As we've said, he lied to get into the United States, and he

22   knew from day one what the operations involved.  He was told

23   before he even did his first delivery that the money would go to

24   the Mujahidin in Iraq to support their fight against U.S.

25   troops.  Before participating in the first weapons operation a

1    month later or several weeks later, he was told that the weapons

2    would be going to al-Qaida.

3        Mr. Earhart was incorrect when he stated that the Stinger

4    missile launchers were the last transaction and it was done just

5    for some kind of sentencing enhancement.  It wasn't.  As the

6    facts show and as we've discussed today, Mr. Hammadi started

7    discussions with the source about Strelas, or missile launchers,

8    the Russian name for missile launchers.  He brought it up.  He

9    said to the source, "I was going to ask why you weren't sending

10   them."  He told how his group had 11 of them but they had been

11   damaged by water.  And it wasn't until one month later, March

12   16th -- and there were still two operations after that -- where

13   they did the missile launcher transaction.

14       Your Honor, based on all of those factors, the -- and I

15   could go into much more detail about his admissions on his IED

16   attacks and his membership in terrorists cells in Iraq -- I

17   think we've covered all the 3553 factors that are relevant that

18   warrant a sentence of life in this case.  I believe that we've

19   discussed the information that's contained in the presentence

20   report, which also sets forth an advised guideline sentence of

21   life imprisonment, and for that reason, Your Honor, we would ask

22   that you sentence this defendant in accordance with the

23   sentencing guideline range and the 3553 factors to life in

24   prison.

25           THE COURT:  Thank you, sir.

1     Mr. Earhart.

2          MR. EARHART:  Your Honor, I think the United States

3     has an obligation to advise the court of Mr. Hammadi's

4     cooperation and has not done so up at this point.  I believe

5     that it's incumbent upon them to do so, and I would ask that

6     they do that.

7          THE COURT:  I'm sorry.  Say that again.

8          MR. EARHART:  I believe it is the United States'

9     obligation to advise the court relative to Mr. Hammadi's

10    cooperation, which was promised to him prior to him sitting down

11    and meeting with them for approximately a week, but they kept

12    bringing him back for more and more meetings.  And they've

13    failed to even mention that at this particular point to the

14    court.

15         THE COURT:  Mr. Schneider.

16         MR. SCHNEIDER:  Sure.  I can address that, Your Honor.

17    Had the defendant provided cooperation to the Government that

18    was substantial and amounted to substantial assistance, as the

19    Government has demonstrated with the prior defendant in this

20    case, we would be here asking the court for a rule -- a 5K

21    sentencing departure.

22         Based on our meetings with the defendant in this case, he

23    did not provide sufficient cooperation.  He provided minimal to

24    none in terms of value to the Government.  And a lot of our

25    meetings with the defendant were no different than his

1    cross-examination today where he was not helpful to the

2    Government.  He was not truthful in talking about things that we

3    were interested in and wanted him to talk about.

4        We still hold open the offer, if he would like to

5    reconsider, stop making excuses, stop being obstructive in

6    meetings with us to discuss cooperation.  We have no objections

7    to meeting him -- with him in the future, and he might be able

8    to earn himself a Rule 35.

9        But to answer Mr. Earhart's question, he's provided no

10   cooperation that warrants any departure, not even minimal

11   cooperation, and for that we didn't even raise it because there

12   was nothing to raise, Your Honor.

13             THE COURT:  Thank you.

14             MR. EARHART:  Your Honor, I won't accept that at his

15   word.  Mr. Hammadi was called back to meet with the FBI over,

16   and over, and over again over the course of several weeks

17   following his plea in this case.  The FBI agents told me that

18   they believed he was being forthright and truthful with him, and

19   that the information was valid.  And I suspect that the reason

20   he's not getting a motion is because we didn't do, as his

21   predecessor, and just stand here and say we have no objection to

22   whatever it is they decide they want to do.

23       Having said that, I would represent to the court that

24   Mr. Hammadi has met with the United States under the guise that

25   there would be some consideration for his cooperation.  Had I

1    known -- and, frankly, he should fire me -- that if he pleads

2    guilty and cooperates, the recommendation is going to be life,

3    that's ridiculous.  That's absolutely ridiculous and I would

4    have no right to ever do that to a client.  He could go to trial

5    and he couldn't get more than life.

6       So I just really take exception to that.  I've never had

7    this experience before, and I can assure the court and the

8    United States I will never have it again, but it's their motion

9    and they've said they're not making it.

10       Having said that, if everything was so clear, and so simple,

11    and so mathematical, it would be easy.  To stand here and

12    suggest that Mr. Hammadi should receive a sentence greater than

13    Mr. Alwan is disingenuous.  It is clearly disingenuous.  It's

14    purely meant to simply take it out on Mr. Hammadi because of the

15    course he took to evaluate the case, to proceed in the case,

16    which frankly should be taken out on his counsel, because of the

17    nature of the case and the offers that were made.

18       I regret that we didn't just go forward with the trial at

19    this point, because having said that, there would be no

20    difference in standing here before the court arguing against the

21    United States for life, but we didn't do that.  He pled guilty.

22    He accepted responsibility for what he's done.  We opened our

23    remarks with "We're not trying to minimize anything or make

24    excuses for Mr. Hammadi."  And neither is Mr. Hammadi.  He knows

25    it is wrong.

1        If you ask Mr. Hammadi if he seeks to hurt anybody, he'll

2   tell you, no, he doesn't and he hasn't.  He's a teenager in Iraq

3   at the time they're claiming all these things occurred, a

4   teenager, 15, 16, 17 years old.

5        This was not his scheme and that's clear from the evidence

6   in this case.  This scheme was not originated by Mr. Hammadi.  A

7   21-year-old is approached by adults.  You saw Mr. Alwan.  I

8   don't know the confidential informant, but I'm sure he's very

9   skilled at what he does or he wouldn't be doing the work that he

10  does.  He's pumped up.  He' recruited.  He's -- "Let's -- let's

11  get help back to the Homeland," or whatever.  I know we can sit

12  here and say -- or look at it and say, "Well, he's a terrorist

13  because he -- he has this belief that there's something

14  happening in his country that may be wrong."  What a narrow

15  view, what a narrow view.

16       Mr. Hammadi does not dislike the United States.  He does not

17  dislike United States citizens.  He does dislike bombs being

18  dropped on the house of his neighbors and his family.  And who

19  wouldn't?  I mean, who wouldn't take exception to that?  I mean,

20  can you imagine if that's what Bowling Green looked like in five

21  years?  Just imagine that.

22       In Mr. Hammadi's world, what he was doing here in the United

23  States was no different than what he saw being done daily in his

24  country relative to weapons.  Now, should he have known better?

25  Absolutely.

1          This is a person who's educated in Iraq.  He arrives in the

2     United States 19 years old -- basically, 19, 20 years old, and

3     he leaves Iraq.  He's in Syria.  And we're going to ascribe to

4     him the international knowledge of, quote, who the terrorists

5     are and what is appropriate and not appropriate conduct in a

6     country where he doesn't speak their language, is being

7     recruited by people -- I mean, pumping up a 20 year old to do

8     something really, really stupid.  And that's exactly what it

9     was, really, really stupid, very poor judgment on his part.

10         Is he responsible for it?  Absolutely, he's responsible for

11    it.  Does he know that?  Yes, he does know that.  But to sit

12    here and suggest that Mr. Hammadi should receive a life sentence

13    is simply unreasonable.

14         If we discount the guidelines even for taking out -- perhaps

15    we don't get to the point of sentencing entrapment to the

16    fullest nature and extent to warrant abandoning the mandatory

17    minimum, but I would suggest to the court, Mr. Hammadi did

18    not -- they could have brought a nuclear weapon.  It wouldn't

19    have made any difference.  If they wanted to -- I don't know why

20    they didn't.  They might as well.  It didn't matter.

21    Mr. Hammadi's role was to carry it from the storage unit to the

22    truck, whatever it was, when he got there.  It didn't make any

23    difference to him what it was.  He didn't have any place for it

24    to go.  He didn't have any place to acquire it.  He didn't set

25    the times, the places, the items, or anything of that nature.

1       And I notice they're very careful when they say how they

2   didn't pay Mr. Hammadi, but you've never heard them tell you

3   they didn't Mr. Alwan, and they never said that one time.

4       And then you heard Mr. Hammadi tell you how he owed Alwan

5   money at the time, how he was broke at the time, how he had told

6   him a couple of times, no, he didn't want to help him out at all

7   and finally he did and that's what happened.

8       Should he have discontinued his conduct?  Absolutely, he

9   should have.  Should he have not gotten involved to begin with?

10  Absolutely, he should have.  Did the other people who were

11  approached and didn't get involved, should they be commended?

12  Yes, they should, because they showed a more mature attitude and

13  a more mature judgment that we're now trying to ascribe to a 21

14  year old who's in a foreign country, who doesn't speak their

15  language, who doesn't have any money, has relatively minimal

16  education at the time, and makes a very poor choice.

17      I'm not going to belabor this, because I know the court's

18  given it a great deal of thought already.  I'm confident of

19  that.  And I'm not going to, you know -- but if you look at the

20  history and characteristics of the defendant, the history and

21  characteristics of the defendant are he has no criminal history.

22  It's right in the presentence report, to which the Government

23  has no objection.  He has zero criminal history points, nothing,

24  absolutely nothing.

25      He is a teenager at the time he leaves his country, 19 years

1    old.  He's not 30, 40, 25, 26, never been a member of a military

2    group or military organization.  He's told you that.  He told

3    you that he embellished that to make himself part of this, to

4    make himself a part of what was going on.

5        He was a high school student at the time these events were

6    taking place in Iraq.  He was 15 years old in 2003, and he was

7    18 years old, basically, when he left to go to Syria; the nature

8    and characteristics of the defendant.

9        The circumstances of the offense.  The circumstances of the

10   offense we've already gone over in great detail.

11       The need for the sentence imposed.  Obviously, he's going to

12   receive a significant sentence.  Mr. Alwan just moments ago

13   received a significant sentence.  I don't think a sentence of

14   life -- a sentence of 25 years is anything insignificant in

15   light of these particular circumstances.

16       The kinds of sentences available.  He's going to prison.

17   He's been in jail.  He's going to prison.  He knows he's going

18   to prison so that's the kind of sentences available.

19       The kind of -- the sentencing range of the guidelines.  As I

20   indicated, I understand the guideline range is a 43 with a

21   recommendation of life, but under these circumstances, for

22   the -- for what I would classify as the lesser of the two people

23   involved in this particular offense, a sentence of greater than

24   40 years that Mr. Alwan received would not seem to be

25   reasonable.

1    And that goes down to the sixth element, the need to avoid

2    unwarranted sentencing disparity.  I understand that the

3    disparity will be judged on the fact that Mr. Alwan provided

4    substantial assistance and claiming that Mr. Hammadi didn't.  I

5    mean, that -- that's -- I guess maybe Mr. Alwan can provide

6    substantial assistance because he's involved in more criminal

7    conduct.  I don't know.  So, I mean, that's kind of a

8    double-edged sword when you look at it.

9    If Mr. Hammadi was unable to provide substantial assistance,

10   part of it is probably because of his youth and the other part

11   is probably because of his involvement.  He may not have the

12   substantial assistance to provide that Mr. Alwan might, who is

13   charged with killing U.S. troops in Iraq, which Mr. Hammadi is

14   not charged with.

15   I think if the court looks at all the factors under 3553(a),

16   looks at the cases as it is opposed to Mr. -- or opposed on

17   Mr. Alwan's case and gives the sentence to Mr. Hammadi, a

18   sentence of 25 years is not unreasonable in this case.

19        THE COURT:  Thank you, Mr. Earhart.

20   Mr. Schneider.

21        MR. SCHNEIDER:  Judge, I would only add briefly,

22   without reviewing everything I've already discussed -- there's

23   no need for that -- but Mr. Earhart, whenever he discusses the

24   relevant activity of this defendant, calls him an immature kid,

25   as if he went out and had too many beers and got behind the

1    wheel one day.  He was a terrorist in Iraq.  Mr. Earhart has not

2    said that.

3        He questioned him for over an hour on direct examination and

4    skipped from 2003 to 2009.  I don't know if he thinks the court

5    is stupid.  We don't.  We trust the court's opinion.  We know

6    that you've heard the evidence that he admitted to the source

7    that he was a terrorist in Iraq and conducted IED attacks.  He

8    admitted it to the FBI and he admitted it again on cross-

9    examination here.  You can't leave out the facts and call him an

10   immature kid that just got into something he didn't know.

11       He was a terrorist.  He took part in, by his admission, more

12   than ten IED attacks on U.S. troops, in addition to shooting at

13   them with machine guns.  That was his activity before he arrived

14   in the United States.

15       He lied to get into the United States, and he knew from day

16   one what he was doing in the United States.  Why did he get

17   involved?  Because he was motivated by assisting his brethren in

18   Iraq.  He had been a fighter in Iraq.  So no matter how many

19   times Mr. Earhart can say it, leaving out the most pertinent

20   facts, they can't be ignored.  He was a terrorist in Iraq.  He

21   lied to get into the United States.  He took part in material

22   support activity here knowing it was going to terrorists in

23   Iraq.

24       With that being said, we make no motion.  There was no

25   effective cooperation in this case, despite what Mr. Earhart has

1    brought up, and we believe that the only reasonable sentence is

2    the one under the guidelines, under the 3553 factors, and that's

3    a sentence of life, Your Honor.

4        THE COURT:  Thank you.  In this case the defendant, on

5    February 15th, 2012, had a 12-count superseding indictment that

6    was returned against him in the Western District of Kentucky

7    here in Bowling Green.  Counts 1, 2, 4, 6, and 8 charge

8    attempting to provide material support to terrorists between

9    January 27th, 2011 and May 25th, 2011 in Warren County.  Counts

10   3, 5, 7, and 9 charge attempting to provide material support and

11   resources to a designated foreign terrorist organization between

12   February 16th, 2011 and May 25th, 2011.

13       Count 10 charged conspiracy to transfer, receive, possess,

14   and export surface-to-air missile launcher system on or about

15   March 16th, 2011 in Warren County.  And Count 11 and 12 charge

16   false statements with respect to material facts in applications

17   required by immigration laws.

18       In this case, there are a lot of factors the court takes

19   into consideration in reaching its decision.  Kind of outlining

20   the factual background, which interplayed with all the factors

21   set forth in 3553(a), the court takes note of the defendant's

22   background in Iraq, the violence that surrounded that situation,

23   friends and innocent people that he saw killed, his migration to

24   here and what occurred here in Bowling Green after he arrived.

25       Defendant's argument notes in particular that he was

1   recruited by the confidential informant to assist -- recruited

2   by Mr. Alwan to assist rather.  He was a 23-year-old refugee, no

3   job, no money, no phone, no food, living in pretty tough

4   situations, behind on his rent.  He had no access to weapons or

5   money.

6       The Government furnished -- the money that was allegedly to

7   be shipped to Iraq was furnished by the Government, that is the

8   money and the weapons.  The defendant also points out that his

9   involvement here in the United States was just merely carrying

10  the weapons from a storage bin to a vehicle.  The defendant also

11  argues that he had -- the defendant had no role in securing the

12  weapons.  The defendant mentioned in his memo -- hadn't talked

13  about it much today, but talked about it a lot about the book

14  titled *Terror Factory:  Inside the FBI's War on Terrorism* by a

15  gentleman named Trevor Aaronson.  In that the author criticizes

16  the FBI's role in allegedly financing terrorist plots in the

17  United States in commenting that defendants often had no real

18  connection to terrorists and the government provided the money

19  and the firearms, and also commenting in that book that most of

20  these defendants did not have the capacity for terrorism and

21  most were incapable of committing the act of terrorism on their

22  own.

23      In the memorandum, defendant argues about sentencing

24  entrapment for downward departure.  And I won't go through all

25  the arguments you made in that memo.  It's of record and I have

read it, and I understand the arguments that you've made in regard to sentencing entrapment on -- in general on sentencing entrapment in regard to downward departure and sentencing entrapment in regard to downward departure when there's a mandatory minimum involved.

The court -- the record is -- and the PSR outlines Mr. Hammadi's involvement.  On November 10th, 2010, Alwan asked the source, the CHS, as we referred to it before, if he had car money.  CHS asked him if his friend, who is later identified as Mr. Hammadi, was suitable for their organization and advised Alwan to fill the friend in on the details of the operation.

Prior to the CHS meeting Hammadi, Alwan inferred to the CHS that Hammadi could be trusted and that he was experienced as a former insurgent, much like himself.  Alwan and the CHS discussed that Alwan was to make sure his friend knew that the shipments were for al-Qaida.

On January 25th, 2011, the CHS, Alwan, and Hammadi discussed how Hammadi had been previously arrested in Iraq after being -- after having emplaced IEDs.  Hammadi explained that his group had a flat tire and as a result were arrested.

The CHS explained to Hammadi that he would participate in an upcoming operation that would involve sending money to the Mujahidin in Iraq.  The CHS explained that their group had sent different amounts money in the past ranging from 200,000 to $600,000 per shipment.  Hammadi advised there would be less risk

if larger amounts of money were broken into smaller amounts over multiple shipments. Hammadi also stated, quote, "The important thing is the goal," close quote.

On January 27th, 2011, CHS brought Alwan and Hammadi to the tractor-trailer with a pallet containing compartments, and they made a transaction there thinking they were hiding money and firearms in that hidden compartment.

On February 15th, 2011, the CHS told Alwan that he had two RPGs, two machine guns, two boxes of C4, and two sniper rifles for delivery. Alwan questioned him about the sniper rifles. Later that day Alwan and Hammadi were sent to the storage facility, videotaped them handling the weapons and placing them in duffel bags. Even later the CHS and Alwan went to Wal-Mart to buy some timers.

On February 16th, 2011, CHS, Alwan, and Hammadi met and discussed the weapons being delivered. The CHS told Alwan and Hammadi that the weapons were being sent not only to al-Qaida but to all Mujahidin. Alwan and Hammadi then picked up the weapons from the storage facility and delivered the weapons to the tractor-trailer. Videotape captured them doing that.

The CHS mentioned that there may be future shipments of Strelas, Russian launcher missiles. Hammadi replied that he was going to ask CHS about sending them to Iraq. Hammadi explained that his group in Iraq had 11 of them -- this has been commented on earlier -- but they were buried underground and damaged by

1    water.  Later in the day, Alwan told CHS how happy he was to be

2    assisted in the operation.

3        On March 15th, 2011, the CHS told Alwan and Hammadi they

4    would do a test run on two Stinger missile launcher systems and,

5    if successful, would send 20 to 30 the next shipment.  Hammadi

6    also told the CHS that he would contact an associate to find out

7    the specific details regarding the manufacture of an explosive

8    compound using cocoa.  Hammadi explained that he was familiar

9    with it and had seen it before in Iraq but did not know the

10   exact proportion of ingredients to make it.  Hammadi then

11   discussed how his group in Iraq had used the explosives.

12       Later that day, Hammadi and Alwan was seen packing the

13   Stinger missiles for delivery the next day.  And on March 16th,

14   the next day, they did put bundles of them in the trailer, along

15   with money.

16       April 4th, 2011, Hammadi told CHS about the first time that

17   he went out for an operation in Iraq and that he had held a

18   weapon before -- had not held a weapon before that.  Hammadi

19   stated it was against the Americans and was at a checkpoint.

20   Hammadi was about to fire his weapon and then it jammed.

21       On April 5th, Hammadi told the CHS that he missed, quote,

22   "executing," close quote, a reference to executing attack

23   operations in Iraq.  In reference to a discussion about a prior

24   car bomb in Iraq, Hammadi explained that he knew about it in

25   advance, saying "We gave them the stuff," referring to the

1    explosives.

2       April the 6th, 2011, Hammadi and Alwan told the CHS about

3    individuals they knew in Iraq that had participated in IED

4    attacks.  Hammadi told CHS about an IED attack in which he

5    participated targeting trucks that were travelling on the road

6    to Tikrit and stated that, quote, "it hit the truck, it damaged

7    it."  Hammadi later admitted to the CHS that he was part of the

8    Jaysh al-Mahdi terrorist group when he was in Iraq.

9       April 19th, 2011, CHS informed Hammadi that their group had

10   something planned for a U.S. Army captain that had previously

11   been deployed in Iraq and was known to both Hammadi and Alwan.

12   The CHS discussed using explosives to attack the captain, and

13   Hammadi said, quote, "What about an execution attempt?" close

14   quote.

15      The CHS advised that they did not want an assassination but

16   wanted to use a car bomb.  Hammadi advised that using a car bomb

17   would reveal the material used.  Hammadi later stated that such

18   operation shouldn't be limited to one person and that "many

19   things should take place and it should be huge."

20      On April 20th, 2011, Hammadi told the CHS that he had worked

21   for the Tandheem in Iraq.  The term is literally translated as

22   organization and it's a general way al-Qaida is referred to.

23   When asked about how many insurgent operations he was involved

24   in while in Iraq, Hammadi stated, "I mean, we used to do two or

25   three operations a day in Baghdad.  I used to do every day in my

1  neighborhood."  He later stated he did not know the exact number
2  because "I never counted."

3      The CHS then asked Hammadi if there was a lot of reference
4  to his use of explosive devices and Hammadi responded "yes."
5  Hammadi also said, "It happened a lot."  Then he -- that he
6  participated in raids where his friends were killed in front of
7  him.  Hammadi also discussed his participation in an attack in
8  Iraq.

9      April 21st, 2011, Alwan and Hammadi picked up some C4
10 explosives and a box containing 12 hand grenades and money to a
11 tractor-trailer.  They also discussed using IEDs.

12     On May 25th, 2011, Alwan and Hammadi picked up and delivered
13 machine guns, rocket-propelled grenade launchers, and two cases
14 of C4 plastic explosives to a tractor-trailer.  They were
15 arrested on the scene at that time.

16     After his arrest, Hammadi waived his Miranda rights and
17 consented to be interviewed by the FBI.  Over the course of the
18 various interviews Hammadi stated the following:  Hammadi stated
19 he was associated with the Jaysh, J-A-Y-S-H, Mujahidin terrorist
20 groups in Iraq.  Hammadi also talked about how to build and use
21 IEDs in Iraq.

22     Hammadi told of his first attack on U.S. forces in Iraq in
23 2006.  He stated it was on a main highway in Iraq and the IED
24 was placed on the side of the road and covered with sand.
25 Hammadi stated the IED was detonated by a remote device, and

that Hammadi and his associates targeted a Humvee and multiple trucks.

Hammadi's participation in a second attack came about a month later, and this attack targeted an American convoy. Hammadi believed the IED detonated did minimal damage. Hammadi discussed participation in a third IED attack in 2007 in the same area that also targeted an American convoy.

Hammadi stated he participated in approximately five attacks with his first cell leader. Hammadi stated that he participated in activities in Kentucky in order to support the fight against American troops in Iraq. Hammadi believed the shipments of money and weapons from Kentucky were going to al-Qaida in Iraq. Hammadi stated he was familiar with machine guns because he carried them in Iraq.

Hammadi advised that his first use of a weapon in Iraq was when he fired on a U.S. soldier at an observation tower in Iraq. Hammadi explained that he participated in approximately five IED attacks with his first cell leader and then participated in another five or six attacks with a new cell leader. The new cell leader brought Hammadi and his associates to be part of al-Qaida.

Hammadi stated that he was arrested in Iraq for planting IEDs. Hammadi admitted that one of his goals in Iraq was to kill Americans.

Assuming that -- while the case law may be strong, that the

1    Sixth Circuit does not apply sentencing entrapment in this case

2    for the purposes of this discussion -- yes.

3              THE INTERPRETER:  Your Honor, can you --

4              THE COURT:  I'm sorry.

5        While the case law may be strong that the Sixth Circuit does

6    not recognize sentencing entrapment as a reason for downward

7    departure, the court will assume that it is a proper

8    consideration for the court to take in determining whether

9    downward departure is appropriate.  The court finds that no

10   sentencing entrapment evidence was sufficient to justify a

11   downward departure in this case.

12       Defendant's past actions in Iraq demonstrate a connection to

13   terrorism and clearly a capacity for terrorism, not only a

14   capacity but conduct of terrorism.

15       Assuming the court can downward depart as argued by the

16   defendant to avoid a mandatory minimum in this case, the court

17   finds there was insufficient evidence to warrant such a

18   departure.  There was insufficient evidence of inducement,

19   insufficient evidence of lack of predisposition to warrant a

20   downward departure under any argument concerning sentencing

21   entrapment.

22       Mr. Hammadi's comments on the tapes, which the court has

23   just recited and as contained in the investigative file seem to

24   indicate that the important thing of the operation was the goal,

25   which was sending money and a variety of weapons to Iraq to

1    fight Americans.  He knew the weapons were being sent to

2    al-Qaida and other terrorist organizations.  He was familiar

3    with Strelas, the Russian missile launchers, from his past

4    experience with them in Iraq.  He was familiar with the

5    manufacture of explosive compound using cocoa but did not know

6    the exact ingredients.  His group in Iraq had used that

7    explosive.

8        He described his involvement in various instances at

9    checkpoints in Iraq, his involvement with car bombs and IEDs in

10   Iraq, and his participation in terrorist activity in Iraq.  He

11   was involved in the terrorist activity here from January 25th

12   until his arrest.  He was a member of a group in Iraq that was a

13   known terrorist organization and generally referred to as

14   al-Qaida.  He was actively involved in insurgent activities

15   there, and he as much admitted all those during the course of

16   his post-arrest interviews.

17       It is true that Mr. Alwan's conduct seems to be greater than

18   Mr. Hammadi's is, however, that does not diminish what Hammadi

19   did on his own.  And making consideration as to Mr. Hammadi's

20   punishment is based solely on his own actions, not on what

21   Mr. Alwan did or didn't do.

22       I have -- I can understand and it's difficult for the court

23   to comprehend, I'm sure, the situation that Mr. Hammadi faced

24   when he was young in Iraq after the United States' invasion.

25   I'm confident that he saw it was dangerous and that in any type

1    of war zone there was violence.

2        It's equally difficult for the court to comprehend the

3    situation American soldiers face in performing their duty after

4    being sent to Iraq and being attacked by insurgents, who they

5    really could not identify as to whether they were the bad guy or

6    the good guy.  And I'm equally confident that they experienced a

7    tremendous amount of danger and a tremendous amount of violence.

8        The court considers all these factors.  And in considering

9    this information, and considering the advisory sentencing

10   guidelines, and 18 United States Code 3553(a), imposes the

11   following sentence:

12       It is the judgment of the court that the defendant is

13   committed to custody of bureau of prisons for a term of life as

14   to Count 10 in the indictment, 180 months as to Counts 1 through

15   9, and 120 months as to each of Counts 11 and 12, to run

16   concurrently with each other, for a total term of life

17   imprisonment.

18       Upon release from imprisonment, the defendant shall be

19   placed on a term of supervised release for a term of life as to

20   each of Counts 1 through 10, and three years as to each of

21   Counts 11 and 12, which shall run concurrently, for a total term

22   of life.

23       The defendant shall abide by standard conditions of

24   supervision adopted by the court, as well as special conditions

25   of which a copy has been provided to defendant and counsel.

These special conditions include not re-entering the United States without permission, if deported, which will be explained by the probation office.

Defendant shall pay a special penalty assessment fee of $100 as to each count of conviction for a total special penalty assessment of $1,200.  Any financial sanctions imposed shall be paid in accordance with the schedule of payments page contained in this judgment.

Restitution is not an issue in the case.  A fine and the costs of investigation, prosecution, incarceration, and supervision are waived due to defendant's inability to pay.

The court determines that the defendant has a low risk of substance abuse.  Mandatory drug testing is hereby suspended until further order of the court.

I think he's here on a superseding indictment.  The original indictment is dismissed as to the defendant.

The court is well aware of the factors set forth in Section 3553(a), which I've mentioned before, which the court should consider, and that is the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; to provide the defendant with any needed

1   educational/vocational training, medical care, or other

2   correctional treatment; the kinds of sentences available; and to

3   avoid disparity in sentencing.

4       The court believes that the factual record that the court

5   has gone through during this colloquy here during the sentencing

6   part of this matter clearly shows that each of the factors set

7   forth in Section 3553(a), in the court's opinion, weighs in

8   favor of the sentence given by the court.

9       The court notes that he has a total offense level of 43,

10  with a Criminal History Category of VI.  The advisory guideline

11  ranges are life imprisonment, a fine of $25,000 and up to $2

12  million and two years up to life of supervised release.  For all

13  the reasons previously set forth in the record, the court

14  believes a sentence of life in prison, followed by life

15  supervision, falls within the advisory guideline ranges and is

16  sufficient but not greater than necessary to comply with the

17  purposes set forth in Section 3553(a)(2) and satisfies the

18  statutory provisions.

19      The court's mindful that the other defendant received only a

20  term of 40 years.  That had to do -- as Mr. Earhart mentioned a

21  moment ago, it had to do with the motion filed by the

22  Government.  The Government -- the court can't make that motion

23  for the Government.  The power to make that motion rests solely

24  in the prerogative of the Government as to whether or not it's

25  going to make a motion for downward departure.  For reasons

1    known only to them, they did not make such a motion.  And for

2    the reasons they provided to me as to why they made the motion

3    in the other case, I thought the departure was warranted.

4        The defendant stands convicted of multiple counts of

5    terrorism.  Although no weapons were ever sent out of the United

6    States, with every shipment he loaded, Mr. Hammadi's intent was

7    to cause grave danger to United States soldiers stationed in

8    Iraq.  He's admitted to his involvement in placing IEDs while he

9    was living in Iraq.

10       In order for the sentence to reflect the seriousness of the

11   offense, promote respect for the law, and provide just

12   punishment and afford adequate deterrence, the court believes

13   the sentence it's given is appropriate in this matter.

14       Mr. Hammadi, you may appeal this sentence, if you want to do

15   so.  If you want to appeal it, you need to file a notice of

16   appeal within 14 days after the court enters an order setting

17   your sentence.

18       And, Mr. Earhart, I -- if we could have the interpreter read

19   that to him too, please.  That's a document setting his appeal

20   rights.

21       But, Interpreter, read that to him in Arabic, please.

22            THE INTERPRETER:  Your Honor, you asked if I would

23   read it for him.

24            THE COURT:  Yes, sir.

25            THE INTERPRETER:  He signed it but --

```
 1              THE COURT:  Would you read it to him -- he may be able

 2     to read.  Would you read it to him anyway, please.

 3              (Interpreter conferring with defendant.)

 4              THE COURT:  Anything further on behalf of the United

 5     States?

 6              MR. SCHNEIDER:  Nothing else, Your Honor.

 7              THE COURT:  Anything further on behalf of the

 8     defendant?

 9              MR. EARHART:  No.  Just Mr. Hammadi wished to thank

10     the court for listening to him.

11              THE DEFENDANT (in English):  Thank you.

12              THE COURT:  Good luck to you, sir.

13              (Proceedings concluded at 4:59 p.m.)

14                    C E R T I F I C A T E

15       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

16     THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

17

18         s/Dena Legg                        March 19, 2013

19     Certified Court Reporter No. 20042A157      Date
       Official Court Reporter
20

21

22

23

24

25
```

```
 1                              INDEX

 2      DEFENSE WITNESS:

 3      MOHANAD SHAREEF HAMMADI
             Direct Examination By Mr. Earhart         13
 4           Cross-Examination By Mr. Schneider        30

 5

 6                            EXHIBITS

 7      GOVERNMENT:
        Exhibit 1 - photo                              43
 8      Exhibit 2 - photo                              43
        Exhibit 3 - photo                              43
 9

10      DEFENDANT:
        No Exhibits
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```