# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### BOWLING GREEN DIVISION
### CIVIL ACTION NO. 1:15-CV-00035-TBR
### CRIMINAL ACTION NO. 1:11-CR-00013-TBR

**MOHANAD SHAREEF HAMMADI**                                    **MOVANT/DEFENDANT**

**VS.**

**UNITED STATES OF AMERICA**                                    **RESPONDENT/PLAINTIFF**

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND RECOMMENDATION

### I. INTRODUCTION

This matter is before the Court on the motion (DN 148) of Mohanad Shareef Hammadi ("Hammadi") under 28 U.S.C. § 2255 to vacate, set aside, or correct his life sentence. In support of this motion, Hammadi filed an affidavit with this Court (DN 150). The United States responded (DN 176). Subsequently, this Court held an evidentiary hearing on June 14, 2016 (DN 192).

Following the evidentiary hearing, Hammadi filed a brief in support of his initial motion (DN 194). The United States responded (DN 201). Hammadi replied (DN 205), and this matter is ripe for determination.

### II. BACKGROUND AND PROCEDURAL HISTORY

This case has a complicated and storied history, but no fact concerning the events leading to Hammadi's indictment is at issue here. By way of introduction, the undersigned offers the factual overview provided by the Sixth Circuit Court of Appeals:

> Hammadi's story, as in many terrorism cases, begins with someone else. In 2009, the Federal Bureau of Investigation launched an investigation of Waad Ramadan Alwan—an Iraqi national living in

Bowling Green-after his fingerprints appeared on fragments of an improvised explosive device ("IED") in Iraq.   During the investigation, the FBI introduced Alwan to a confidential human source ("CHS"), who met with Alwan and recorded their conversations starting in August 2010.   The CHS led Alwan to believe that the undercover government agent was part of a group sending money and weapons to the Mujahidin—Muslims engaged in Jihad, a holy war against infidels—in Iraq.   During their conversations, Alwan described his past actions as an insurgent in Iraq to the CHS, including his use of IEDs and sniper rifles against American soldiers.

Between September 23, 2010 and January 10, 2011, Alwan assisted the CHS in sending what Alwan believed to be money and weapons to the Mujahidin several times.   By January 11, 2011, Alwan was asking to lead the Bowling Green cell of the CHS's fictional terrorist organization. The CHS instructed Alwan to recruit others, and afterward Alwan approached multiple people whom he suspected of having violent, anti-American views. Several individuals rebuffed his offers to join the cell.   Hammadi accepted.   Alwan then took Hammadi to meet with the CHS and vouched for Hammadi as an experienced Iraqi insurgent.

In Iraq, as Hammadi would later tell the CHS and the FBI, he had participated in approximately ten IED attacks on American troops and convoys with at least two different cells, including al Qaida. Hammadi had been arrested for one of the IED attacks, but bribed his way free and fled to Syria.   Once in Syria, he applied for refugee status in order to immigrate to the United States.   On March 1, 2009, in a "Sworn Statement of Refugee Applying for Admission into the United States form," Hammadi answered "no" when asked if he had engaged in terrorist activity before. Presentence Report ("PSR") at 13, ¶¶ 41–42.   Similarly, in December 2010, when asked on his application for a green card if he had engaged in terrorist activity, Hammadi answered "no." These two answers represent the conduct charged in Counts 11 and 12 in the Superseding Indictment.   *See* R. 62 at 6–7 (PageID # 334–35).

Hammadi entered the United States in July 2009, initially settling in Las Vegas with the help of a Catholic charity.   He had $900 to his name, brought only a carry-on bag filled with belongings, and spoke little English.   He failed to find employment, moving

2

eventually to Bowling Green to work at a poultry factory. Hammadi did so on the recommendation of Alwan, whose family he knew from Iraq and whom he had met in Syria. Hammadi eventually quit his work at the poultry factory, and he claimed to be indigent when Alwan approached him about joining the fictional terrorist cell in January 2011.

For whatever reason, Hammadi agreed to accompany Alwan to a meeting with the CHS on January 25, 2011. At that meeting, the CHS explained the scheme for sending money and weapons to insurgents in Iraq, and Hammadi made recommendations as to how to accomplish their objectives. Then, on January 27, Hammadi and Alwan took $100,000 from the CHS and transported the money to a tractor trailer, believing that it would then find its way to the Mujahidin in Iraq. This conduct violated 18 U.S.C. § 2339A and served as the basis for Count 1. *See* R. 62 (Super. Indictment at 1) (PageID # 329).

On February 15 and 16, Hammadi and Alwan packed two rocket-propelled grenade launchers ("RPGs"), two machine guns, two boxes of plastic explosives, and two sniper rifles into duffel bags. The CHS informed them that these weapons were intended for al Qaida in Iraq. Hammadi and Alwan then took the weapons and placed them in hidden compartments of another tractor trailer, attempting to send the weapons to terrorists, in violation of 18 U.S.C. §§ 2339A and 2339B. This conduct served as the basis for Counts 2 and 3. *See* R. 62 (Super. Indictment at 1–2) (PageID # 329–30).

After they delivered the weapons, the CHS told Hammadi and Alwan that they might ship surface-to-air missiles in the future. Hammadi responded with enthusiasm, expressing his support for sending such missiles given that one of his terrorist cells in Iraq had acquired eleven of them. On March 15, the CHS instructed Hammadi and Alwan that they would send two Stinger-missile systems as a test run, and the next day, Hammadi and Alwan loaded the Stingers into another tractor trailer. These actions also violated 18 U.S.C. §§ 2339A and 2339B and made up the basis of Counts 4 and 5. *See* R. 62 (Super. Indictment at 2–3) (PageID # 330–31). Furthermore, their conspiracy to deliver the surface-to-air missiles violated 18 U.S.C. § 2332g, which the government charged in Count 10. Id. at 5–6 (PageID # 333–34).

3

> Following the delivery of the Stinger missiles, Hammadi and Alwan transported money and weapons—supplied by the CHS and the government—on two other occasions in violation of 18 U.S.C. §§ 2339A and 2339B.  This conduct served as the basis for Counts 6, 7, 8, and 9.  R. 62 (Super. Indictment at 3–5) (PageID # 331–33).  Hammadi and Alwan also plotted to murder a U.S. Army Captain whom they knew from Iraq, and Hammadi admitted to being a member of the "Tandheem," a common euphemism for al Qaida in Iraq.  PSR at 12, ¶¶ 36–37.  During the last delivery on May 25, the FBI arrested Hammadi and Alwan.

United States v. Hammadi, 737 F.3d 1043, 1045-46 (6th Cir. 2013).

Hammadi was indicted as to twelve counts alleging various violations of 18 U.S.C. §§ 1114, 2332, 2332A(a), 2339A, 2339B, 2332(g), and 1546(a) (DN 62 PageID # 329-38).  Counts 1-9 carried a maximum term of imprisonment of fifteen years (Id. at PageID # 336).  Count 10 carried a minimum term of imprisonment of twenty-five years and a maximum of life (Id.).  Counts 11 and 12 each carried a maximum sentence of ten years (Id.).

On May 31, 2011, the Court conducted initial appearance and arraignment proceedings (DN 17 PageID # 93).  Hammadi was present, and the Court determined he qualified for appointment of counsel (Id.).  The Court appointed James Earhart, who was present and accepted the appointment (Id.).  As will be discussed in detail below, Hammadi engaged in plea negotiations with the United States for the next several months.  But negotiations eventually broke down, and Hammadi entered an open plea to all twelve counts of the superseding indictment on August 22, 2012 (DN 91).  The District Judge sentenced Hammadi to a term of 180 months for each of Counts 1-9, a term of life for Count 10, and a term of 120 months for Counts 11 and 12 (DN 113 PageID # 603 SEALED).  All sentences were to be served concurrently for a total term of life (Id.).  Hammadi appealed his sentence to the Sixth Circuit

4

Court of Appeals, who denied all of his claims.  Hammadi, 737 F.3d at 1043.  Hammadi did not

appeal to the Supreme Court of the United States.

### III. DISCUSSION

The undersigned will address the three broad arguments presented in Hammadi's

supplemental motion filed after the evidentiary hearing (DN 194).  This motion incorporates by

reference Hammadi's original 2255 motion (DN 148).  Each of the three arguments contains

multiple subparts alleging various instances of ineffective assistance of counsel.

### A. ARGUMENT I.

Hammadi first argues Earhart was ineffective in plea negotiations.   Specifically,

Hammadi criticizes Earhart for advising him that, if he entered a plea of guilty, he would not

receive a life sentence and may even receive less than the twenty-five year minimum based on

entrapment (DN 194 PageID # 1193).  Hammadi contends that Earhart's advice to plead guilty to

all counts of the superseding indictment constituted sufficiently deficient advice to render the

plea involuntary (Id. at 1194).

Hammadi further contends that he did not know a life sentence was a possible result of

his plea, and had he known that, he never would have pled guilty to begin with (Id. at 1195).

Moreover, Hammadi contends Earhart was ineffective for failing to advise him to proffer with

the government before entering a plea, arguing that, even if the United States concluded he had

not offered substantial assistance, he could at least exercise his right to go to trial (Id. at 1195-

96).

In response, the United States argues that Earhart's decision not to proffer before entering

a plea was a strategic move aimed at ensuring the United States did not possess any

5

impeachment evidence that may hamper Hammadi's ability to testify on his own behalf at trial (DN 201 PageID # 1247).  The United States notes Earhart considered Hammadi to be in a very weak position should the case proceed to trial (Id. at 1248).  Earhart based this assessment on the strength of the United States' evidence, which included audio and video evidence of Hammadi's crimes (Id.).  Earhart hoped the United States would weigh the cost of going to trial, and their analysis might compel them to offer Hammadi a more favorable plea agreement regardless of Hammadi's ability to offer substantial assistance (Id. at 1248-49).  The United States maintains Earhart based this strategy on three factors: Earhart's belief that Hammadi would not receive a downward departure for substantial assistance, the weight of the evidence against Hammadi, and Earhart's belief that the Court would be more likely to offer a more lenient sentence if Hammadi pled guilty rather than being convicted at trial (Id. at 1249).

Next, Hammadi argues that Earhart was ineffective for arguing the issues of sentencing entrapment and sentencing manipulation because both theories have been rejected by the Sixth Circuit (DN 194 PageID # 1199-1200).  Further, Hammadi argues that, even if entrapment, sentencing entrapment, and sentencing manipulation were available defenses, counsel was ineffective for failing to present facts to prove these claims (Id. at 1204).  Additionally, Hammadi contends substantive entrapment was an available defense, and by pleading guilty, he was prejudiced because he could not take this defense to trial (Id. at 1206).  Hammadi further argues he was prejudiced because the guilty plea resulted in a waiver of the substantive entrapment defense on appeal.

With regard to entrapment, sentencing entrapment, and sentencing manipulation, the United States argues Earhart discussed these potential defenses with Hammadi, but Earhart was

not optimistic, even if Hammadi proved sentencing entrapment or manipulation, that the Court would sentence Hammadi below the mandatory minimum (Id. at 1249). Furthermore, the United States responds to Hammadi's argument concerning Earhart's failure to present evidence of a substantive entrapment defense by arguing that Hammadi could not satisfy the predisposition prong of the analysis. Specifically, the United States argues Hammadi admitted to being involved in terrorist activities in Iraq, so he could not possibly prove the lack of predisposition necessary for a successful entrapment defense (Id. at 1260). Finally, the United States argues Hammadi cannot demonstrate any of Earhart's alleged failures created prejudice because, regardless of whether Hammadi's guilty plea waived the defense, the Sixth Circuit Court of Appeals nonetheless analyzed Hammadi's entrapment defense in light of the facts of the case (Id. at 1259 (citing Hammadi, 737 F.3d at 1049)).

ANALYSIS

To establish ineffective assistance of counsel, a defendant must show deficient performance and resulting prejudice. Knowles v. Mirzayance, 556 U.S. 111, 122 (2009); Strickland v. Washington, 466 U.S. 668, 687 (1984). The performance inquiry requires the defendant to "show that counsel's representation fell below an objective standard of reasonableness." Id. at 688. The Court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Id. at 690. The prejudice inquiry requires the defendant "to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. In the context of a criminal trial, the prejudice inquiry requires

7

the defendant to show there is a reasonable probability that, absent trial counsel's errors, the jury would have had a reasonable doubt respecting guilt.  Id. at 695.

The Supreme Court has held that the Strickland test should be applied when a defendant alleges his decision to accept a plea offer was the product of ineffective assistance of counsel. Hill v. Lockhart, 474 U.S. 52, 58 (1985).  Under Hill, the performance prong of the Strickland test remains the same.  Id.  But to establish prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  Id. at 59.

In this case, the principal question is whether Earhart represented to Hammadi that, if he pled guilty, he would not receive a life sentence.  It goes without saying that this advice would represent constitutionally deficient performance.  Hammadi has offered no evidence that Earhart ever made such representations.  At the evidentiary hearing, Earhart testified that he believed it was unlikely Hammadi would receive a life sentence if he pled guilty, but he never guaranteed as much.  Specifically, Earhart testified:

> Q:    All right.  Do you ever tell a defendant that you are definitely going to get this sentence, a specific sentence, if you haven't agreed to it with whichever prosecuting authority you are talking to?
>
> A:    No.  I never tell any defendant they are definitely going to get anything because it's ultimately up to the judge.  However, I can tell them that if the judge rejects it in certain circumstances that they can withdraw their plea.
>
> Q:    All right.  And have you ever told anybody they are definitely not going to get a particular sentence?
>
> A:    No. Well, let me rephrase that.  If somebody asks me if they are going to go to jail because they got a traffic ticket, I'll tell

them "no," because it's not an option.  To that extent, I have told clients that certain things would not be available to them.  For instance, if the statutory maximum is 10 years, I tell them they can't get 20.

Q:     All right.  I'll rephrase it then.  Have you ever told a defendant that they would not get a sentence that was within the statutory ranges for sentencing?

A:     No.

(DN 192 PageID # 1101-02).

Hammadi contends that a note from Earhart's file saying "proffer, recommend 25" and "real good, possibly less" is proof that the United States had offered Hammadi a deal at the twenty-five year minimum, and Earhart hoped to bargain for less (DN 194 PageID # 1199-1200). This argument is unconvincing.  Earhart testified at the evidentiary hearing that he did not remember making the note, but he probably wrote it to reflect what deal he hoped he might get for Hammadi, and not as a memorialization of an actual offer (DN 192 PageID # 1173-74).  In fact, Earhart testified that the one consistency through his negotiations with the United States was that he never received a number (Id. at 1174).  Earhart suggested he may have written the note as a reflection of what the defense was asking for (Id. at 1173).  The United States points out that yet another possible reading of this note is that, if Hammadi provided "real good information," the United States may recommend a reduced sentence (DN 201 PageID # 1266).

Each of these attempts at divining the meaning of this cryptic note is pure speculation, as would be any attempt by this Court.  The undersigned must, as the finder of fact, assess the record as a whole, weigh the credibility of conflicting testimony, and make a determination.  *See* United States v. Schultz, 855 F.2d 1217 (6th Cir. 1988).  Here, the undersigned notes that Earhart

9

has practiced law for over thirty years (DN 192 PageID # 1099).  Of this time, Earhart has spent over twenty-eight years practicing federal criminal law specifically, first as an Assistant United States Attorney, and now privately in criminal defense (Id.).  The undersigned does not think it credible that someone of Earhart's experience would make a guarantee to a client that was not supported by a firm plea offer from the United States.  And moreover, as Earhart noted in his testimony, "I never tell any defendant they are definitely going to get anything because it's ultimately up to the judge" (Id. at 1101).

Earhart's testimony is consistent with that of an experienced defense attorney.  The undersigned finds it unbelievable that Earhart would have advised Hammadi that he was certain not to receive a life sentence.  Given the evidence before the Court, the undersigned finds Earhart's testimony to be more credible and therefore finds Earhart's representation was not deficient in this regard.

The next issue is whether Earhart's advice to Hammadi to refrain from proffering with the United States before entering a plea was constitutionally deficient.  The undersigned finds that it was not.  When the Court assesses counsel's performance, it must make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Strickland, 466 U.S. at 689.  Due to the difficulties inherent in making such an evaluation, the Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Id. at 689.  Thus, Hammadi "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689 (citation omitted).

10

Earhart explained at the evidentiary hearing that he did not advise Hammadi to proffer before entering a plea because he believed the United States would use the information without offering Hammadi anything, and because Earhart did not believe Hammadi possessed useful information.

> The reason that I was not particularly interested in Mr. Hammadi giving a proffer before he made a decision to enter a plea was what I said before, was that I believed that the Government would take the information and not give him anything in exchange, nor did I believe based on my conversation with Mr. Hammadi that he had any great information that the United States would seize upon.  He was 19 years old, I believe, at the time he came to this country.  As I expressed over and over again, I don't know exactly what you guys think he's going to know, and I don't think you are going to be impressed with it.

(DN 192 PageID # 1113-14).

Earhart further contended that, in his experience, the United States is likely to use information gathered in a proffer that does not result in a plea agreement as a tool during cross-examination should a client decide to testify.  At the evidentiary hearing, Earhart explained as follows:

> Q:     But the plea agreement in this case that was discussed in June of 2012 was that you would have an opportunity — or Mr. Hammadi would have an opportunity to plead guilty, but before he entered his plea, he would get to proffer first.  Are you familiar with that, or do you remember that?
>
> A:     I do not remember that.
>
> Q:     That would have been a significant benefit to him, wouldn't it?
>
> A:     Not necessarily, because my experience on a government proffer prior to a trial being resolved is they basically box in your client's ability to testify at trial and take everything he tells them

11

during the proffer and cross-examine him with it to convict him. So no, I didn't see that as a — I would have seen it as a benefit if I didn't have a 19-year-old client who I believed could provide substantial assistance and the Government would be forthcoming with that motion, but I never believed that was going to happen, and it didn't happen.

(Id. at 1112-23).

Earhart's testimony demonstrates his decisions were grounded in strategy, and his strategy was grounded in extensive experience and a realistic view of how the process generally works. While the outcome in this situation was not what Earhart expected, that fact in itself is not enough to overcome the presumption that counsel's conduct "falls within the wide range of reasonable professional assistance[,]" and applying hindsight to Earhart's strategy is precisely the type of analysis the Supreme Court has discouraged. Strickland, 466 U.S. at 689. The undersigned concludes Earhart's performance was not ineffective in this regard.

The undersigned next addresses the matter of entrapment, sentencing entrapment, and sentencing manipulation. Hammadi correctly points out that, by entering into an unconditional guilty plea, Hammadi waived his right to raise an entrapment defense on appeal. Hammadi, 737 F.3d at 1049; See also United States v. Corp, 668 F.3d 378, 384 (6th Cir. 2012) ("Generally, a voluntary and unconditional guilty plea bars any subsequent non-jurisdictional attack on the conviction.") (internal quotations omitted). Earhart faced a strategic choice, and he could not know what the outcome might be. Looking back, it is easy to say Hammadi should have proceeded to trial. But Earhart's decision, based on thirty years' experience in which he had never seen a judge sentence a defendant to life in prison after entry of an unconditional guilty

12

plea, falls well within the wide range of "reasonable professional judgment." <u>Strickland</u>, 466 U.S. at 690.

Moreover, a substantive entrapment defense would have been nearly impossible for Earhart to prove. First, Hammadi argues there were witnesses from Las Vegas and Bowling Green who could testify that Hammadi was not predisposed toward terrorist activity (DN 194 PageID # 1219). More specifically, Hammadi claims witnesses would have testified he did not regularly attend Mosque, and he did not pray five times each day (<u>Id.</u>). But the issue is not a question of Hammadi's piousness, but rather his predisposition toward terrorist activity. These alleged accounts by recent friends could do nothing to mitigate the fact that, by his own admission, Hammadi had belonged to the terrorist groups Jaysh al Mujahidin and al Quaida while still living in Iraq (DN 104 PageID # 524). Also in Iraq, Hammadi used an automatic rifle to fire at an American soldier in a guard tower (<u>Id.</u> at 524). And, the FBI recovered Hammadi's finger prints from pieces of an improvised explosive device found in Iraq. <u>Hammadi</u>, 737 F.3d at 1045. Faced with these facts, any attempt to prove Hammadi was not predisposed to terrorist activity appears fruitless.

Earhart would have similarly struggled to demonstrate inducement on the part of the government. The Sixth Circuit Court of Appeals has held that acts of inducement by a private individual who is not serving as an agent for the government do not constitute inducement for entrapment purposes. <u>United States v. Lee</u>, 694 F.2d 649, 654 (6th Cir. 1983). Thus, even if Alwan testified that he had approached Hammadi multiple times and offered money before Hammadi agreed to take part in the activities, such actions would not satisfy the inducement prong of an entrapment defense. The possibility that Hammadi could have successfully argued

13

entrapment is exceedingly remote.  This fact further bolsters the conclusion that Earhart's advice to plead guilty was objectively reasonable.

The undersigned next addresses Hammadi's alternative claims that either sentencing entrapment and sentencing manipulation are not recognized in the Sixth Circuit, or if they are, that Earhart was ineffective in presenting evidence to support these claims.  First, Hammadi incorrectly contends that both sentencing entrapment and sentencing manipulation have been expressly rejected by the Sixth Circuit (DN 194 PageID # 1199).  Rather, the Sixth Circuit has refused to reach the issue or has rejected the defense in *habeas* cases because the right has not yet been recognized by the Supreme Court.  *See e.g.*  <u>Sosa v. Jones</u>, 389 F.3d 644, 647 (6th Cir. 2004) (Sentencing entrapment has never been accepted by the Supreme Court and is therefore unavailable as a remedy to a *habeas* petitioner.); <u>United States v. Nanez</u>, 168 Fed. App'x. 72, 77 (6th Cir. 2006) (The case at bar gave the court no reason to consider whether the Sixth Circuit should adopt the defense).

Earhart's testimony reflects a clear understanding of the Sixth Circuit's current position, or lack thereof, on the defense of sentencing entrapment.

> A:     The way I read the case law — I was hoping that they would, or I was hoping they would accept it, but in the alternative, I was hoping they would flat-out reject it because that would give us an avenue to pursue it to the Supreme Court.  My understanding of the case law at the Sixth Circuit is while they haven't accepted it, they haven't rejected it.  They just keep saying, "We haven't found it," which puts you on a factual finding rather than a legal finding.  That's never going to get to the Supreme Court.

(DN 192 PageID # 1110).

The undersigned agrees with Earhart's assessment and therefore rejects Hammadi's claim that Earhart was ineffective for presenting these defenses.  However, Hammadi further claims that, assuming sentencing entrapment and sentencing manipulation were cognizable defenses at the time, Earhart was ineffective for failing to present evidence to support these defenses (DN 194 PageID # 1200).  While Hammadi does not explicitly state what evidence Earhart failed to present, the undersigned assumes he is referring to the same evidence discussed above in relation to the substantive entrapment defense.  As previously noted, this evidence fails to persuade and is irrelevant to either a substantive entrapment defense or a sentencing entrapment defense.  Therefore, Earhart was not ineffective in failing to present this evidence.

The next issue is whether any of Earhart's alleged errors resulted in prejudice against Hammadi.  Notably, the undersigned has determined that, with respect to this argument, Earhart's performance was not ineffective.  Thus, as a technical matter, this prong of the analysis is not strictly necessary.  Strickland, 466 U.S. at 697.  But the undersigned will nonetheless address prejudice in the interest of thoroughness.

The prejudice prong in this instance requires four separate analyses.  The first issue is whether Hammadi was prejudiced by his purported understanding of the maximum sentence he could receive if he pled guilty.  The second is whether Hammadi was prejudiced by his counsel's advice that he not proffer with the government before entering his plea.  The third is whether Hammadi was prejudiced by pleading guilty and waiving his substantive entrapment defense.  And the fourth is whether Hammadi was prejudiced either by Earhart's attempt to invoke sentencing entrapment or by Earhart's failure to present evidence in support of the various entrapment theories.

15

With regard to the first issue, the undersigned notes that, for a guilty plea to be voluntary, the Sixth Circuit requires a defendant to be aware of the maximum penalty that may be assessed. King v. Dutton, 17 F.3d 151, 153 (6th Cir. 1994). Thus, if the undersigned accepted Hammadi's contention that he did not understand he might face a life sentence, then, apart from the issue of ineffective assistance of counsel, the plea could not be voluntary. But as noted above, the undersigned finds Earhart's account more credible. As such, there is no prejudice to Hammadi.

The second issue is whether Earhart's advice that Hammadi not proffer with the government before entering his plea resulted in prejudice. As previously noted, Hammadi must show a reasonable probability that, but for counsel's alleged errors, Hammadi would have proceeded to trial. Lockhart, 474 U.S. at 58. However, Hammadi must also demonstrate that, had he opted not to plead, or had his plea process been free from the alleged errors, the resulting sentence would be different. Id. at 59. Potential alternatives outcomes are, where possible, to be considered objectively without regard for the "idiosyncrasies of the particular decisionmaker." Id. at 59-60 (quoting Strickland, 466 U.S. at 695).

It strains credulity to imagine a situation where Hammadi would have proceeded to trial and been found not guilty. Hammadi makes no claims of actual innocence, nor could he do so in good faith given the extensive audio and video evidence. The question, then, is whether it is reasonably probable that Hammadi's sentence would have been less if he was either convicted or had proffered with the United States before entering his plea. Neither is a realistic possibility. Had Hammadi been convicted, he would have faced the same potential sentence handed down by the same District Judge. Moreover, had he proceeded to trial, Hammadi would not have qualified for a downward departure based on acceptance of responsibility as recommended in the

16

presence report (DN 95 PageID # 482 SEALED).  Even if Hammadi had proffered before entering his plea, there is no reason to conclude the United States would have been any more likely to make a recommendation of substantial assistance than when he proffered after entering the plea.

The next issue is whether Hammadi was prejudiced by Earhart's advice that he plead guilty and, as a result, waive his entrapment defense.  The Sixth Circuit, while noting that Hammadi had waived his claim, nonetheless analyzed the entrapment claim in light of the facts available.  Hammadi, 737 F.3d at 1049.  Hammadi has therefore failed to demonstrate any prejudice.

The final issue is whether Hammadi was prejudiced by Earhart's failure to present specific evidence that Hammadi alleges would have contributed to his entrapment defense.  It is true that, had Earhart called more witnesses and better developed this issue prior to the guilty plea, the Sixth Circuit may have had at its disposal a greater volume of facts.  But as discussed above, none of these alleged facts is useful to Hammadi in satisfying either the inducement or the predisposition prongs of a substantive entrapment defense.   Thus, there is no prejudice to Hammadi that these additional facts were not part of the record.

The undersigned concludes that none of Hammadi's claims with regard to Argument I resulted in prejudice.  Therefore, it is recommended that all claims in Argument I be denied.

The final matter to resolve with regard to Argument I is whether a Certificate of Appealability should be issued as to this claim.  Where, as here, a Court has dismissed a claim or claims on the merits, a Certificate of Appealability should only issue if "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v.

McDaniel, 529 U.S. 473, 484 (2000).  It is clear in this instance that Earhart's performance fell well within the range of competent representation.  And, assuming for the sake of argument that counsel's performance was deficient, Hammadi has nonetheless failed to demonstrate prejudice.  Therefore, the undersigned recommends a Certificate of Appealability be denied as to Argument I.

## B. ARGUMENT II

### 1.

In Argument II, Hammadi claims Earhart was ineffective for failing to prepare for trial, including failing to interview witnesses, investigate evidence, and file pretrial motions (DN 194 PageID # 1216).  Much of this argument is given to reapplying the information discussed above concerning various witnesses who may have testified favorably on Hammadi's behalf.  In this instance, Hammadi is arguing that, rather than contributing to an entrapment defense, Earhart's failure to investigate these witnesses constituted ineffective representation in preparing for trial (Id. at 1217-19).  Hammadi does offer a new theory that, had Earhart interviewed Alwan, Earhart would have gathered evidence concerning Hammadi's financial situation that could have been used as part of Hammadi's entrapment defense at trial (Id. at 1218).  Furthermore, Hammadi contends Earhart should have called FBI agents who had interviewed Hammadi as rebuttal witnesses during sentencing (Id. at 1219).

The United States responds that, no matter what favorable opinion Alwan may have offered, testimony concerning his knowledge of Hammadi's activities in Iraq would vitiate any potential benefit (DN 201 PageID # 1261)).  With regard to Hammadi's claim that Earhart should have called FBI agents as witnesses to rebut the United States' substantial assistance finding, the

18

United States offers two counterpoints, one of them factual and the other legal.  As a matter of law, the United States argues a district court may not depart from a finding of substantial assistance absent either a motion from the United States or a constitutional violation (DN 201 PageID # 1267).  And as a factual matter, the United States claims agents would testify that Hammadi was not helpful, that he made excuses for his conduct, and that he was obstructive (DN Id. at 1267).

Hammadi next contends Earhart was ineffective for failing to file a motion to suppress evidence.  Specifically, after Hammadi's arrest on May 25, 2011, Hammadi spent four days in custody before being presented to a judge (DN 194 PageID # 1219).  Law enforcement personnel interrogated Hammadi, and while the government maintains Hammadi waived his Miranda rights as well as his right to presentation before a judge within six hours, his Miranda waiver form was unsigned, and his presentment waiver was not signed until five and a half hours after his arrest (Id. at 1220).  Hammadi constructs an argument regarding the difference between the Central and Eastern Time Zones, presumably arguing that, if Hammadi were arrested in the Central Time Zone, and his waiver time noted in the Eastern Time Zone, there could be a discrepancy of an hour which might result in the waiver being time barred.

Hammadi argues these facts necessitate that counsel file a motion to suppress, and Earhart's failure to do so constitutes ineffective assistance of counsel.  Earhart admitted that the unsigned waiver form might give rise to a motion to suppress in certain circumstances.  Earhart considered filing a motion to suppress at the outset of the case (Id. at 1221) but chose not to do so after reviewing the evidence against Hammadi, describing the hypothetical motion as "an exercise in billable hours" (DN 192 PageID # 1141).

The United States responds that the 302s demonstrate a clear waiver of Hammadi's Miranda and presentment rights. Moreover, the United States notes that speculation that a hearing might have revealed inaccuracies or lies in the 302s does not make Earhart's decision unreasonable (DN 201 PageID # 1270-71 (citing Robinson v. Howes, 663 F.3d 819, 825 (6th Cir. 2011)). Rather, the United States asserts that for this claim to succeed, Hammadi must demonstrate that his motion to suppress would have been successful (Id.).

Additionally, the United States argues even if Earhart had filed the motion, and the motion had been successful, the ruling would have made no difference. The government possessed audio and video of Hammadi's crimes. FBI agents were present when he committed the crimes, and Alwan, Hammadi's co-defendant, was willing to testify (Id.). As such, the United States concludes that, even if Earhart had filed the motion, the result would have been no different, and thus Hammadi cannot demonstrate prejudice (Id.).

The first issue is whether Earhart was ineffective in his trial preparations in failing to investigate certain witnesses. Trial counsel has a duty under the Sixth Amendment "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. This duty includes an obligation to investigate any witnesses who may possess information relevant to the defendant's guilt or innocence. Towns v. Smith, 395 F.3d 251, 258 (6th Cir. 2005). Performance should be assessed for reasonableness, applying a heavy measure of deference to counsel's judgment. Id. "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable'." Id. (quoting Roe v. Flores-Ortega, 528 U.S. 470, 481 (2000)).

Nothing in the record suggests Earhart was ineffective for deciding not to interview federal agents. On the contrary, at the evidentiary hearing, when asked why he did not call these officials, Earhart stated, "I generally believe as a defense attorney that I call witnesses who have favorable information. I'm not aware of any federal agent who is going to take the stand and testify favorably on behalf of Mr. Hammadi" (DN 192 PageID # 1109). This is nothing if not reasonable. The United States argued at sentencing that, far from being of substantial assistance, Hammadi was obstructive and uncooperative (DN 123 PageID # 689-90). Neither Mr. Earhart at the time nor Hammadi since has offered any evidence to the contrary. Moreover, the United States offered to meet again with Hammadi and reevaluate their decision (Id. at 690). Given this evidence, Earhart was wise not to call to the stand agents who would serve no other purpose than to reinforce the United States' position. Earhart's actions were not only reasonable, but strategic, and his performance was therefore not deficient.

As for Earhart's decision not to interview character witnesses from places as diverse as Las Vegas and Iraq, the undersigned again finds nothing unreasonable about this decision. Certainly, Earhart may have chosen to contact these witnesses and ask them to testify as to their perceptions of Hammadi's character. But Hammadi offers nothing but speculation to indicate any of them would have been willing to testify. Notably, Hammadi was free to contact any of these witnesses and obtain affidavits from them affirming their alleged shock that Hammadi would be involved in illegal activities. Hammadi could have even presented these witnesses at the subsequent evidentiary hearing. Yet none of these witnesses has come forward since offering their initial disclosures to federal agents. Such speculation cannot form the foundation necessary for a finding of ineffective assistance of counsel, particularly given the high level of deference a

21

reviewing court must afford counsel's decisions.   Towns, 395 F.3d at 258.   Additionally, Hammadi does not make, nor does there exist, any argument that these witnesses could offer any testimony relevant to Hammadi's guilt or innocence.   Regardless of whatever shock they may have expressed upon learning that Hammadi had been captured on video committing acts of terror, their surprise does nothing to weaken the government's case against Hammadi. Furthermore, Hammadi's knowing and voluntary decision to plead guilty terminates any further need for Earhart to investigate these witnesses. *See* Strickland, 466 U.S. at 691.

Next, Earhart was not ineffective because he opted not to call Alwan to testify.  Even if Alwan had offered testimony concerning Hammadi's financial situation, Earhart's decision to call him would have allowed the United States to bring up Alwan's knowledge of Hammadi's terrorist activities in Iraq.  This testimony would have mitigated any benefit Alwan may have provided by rendering any claim that Hammadi lacked predisposition toward terrorist activities untenable. As with Earhart's decision not to call certain federal agents, his decision not to call Alwan is not only reasonable, but it is strategic.   Earhart's performance in this regard was therefore not deficient.  *See* Towns, 395 F.3d at 258.

The next issue is whether Earhart was ineffective for failing to file a motion to suppress. Counsel's failure to file a motion to suppress is not a *per se* violation of a defendant's Sixth Amendment rights.  Kimmelman v. Morrison, 477 U.S. 365, 384 (1986).  Counsel "'has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.'"  Id. (quoting Strickland, 466 U.S. at 688).  Counsel's decision not to file certain pretrial motions will not constitute ineffective assistance of counsel unless the defendant can

22

demonstrate that, had counsel filed the motion, a favorable ruling would have reasonably resulted in a different verdict. *See* Austin v. Bell, 126 F.3d 843, 848 (6th Cir. 1997).

Here, the only close call is whether Earhart should have filed a motion challenging the presentment waiver that Hammadi signed five and a half hours after his arrest. Again, Hammadi offers nothing other than speculation. Hammadi questioned Earhart about the timing of the waiver at the evidentiary hearing, inquiring why Earhart didn't do more to ensure the accuracy of the time listed on the waiver (DN 192 PageID # 1140-41). But Hammadi has offered no further affidavits, nor did he call any witnesses, to lend credence to his argument that an oversight in the change of time zones resulted in Hammadi's signing an invalid waiver.

Even accepting, for the sake of argument, that Hammadi was arrested in the Central and subsequently transported to the Eastern Time Zone for questioning, and also accepting Hammadi's contention that the time listed on the presentment waiver was noted in Eastern time, Hammadi's theory nonetheless collapses upon itself. The Eastern Time Zone runs one hour later than the Central. Thus, if the time of arrest were listed in Central time, and the time of the waiver were listed in Eastern time, Hammadi would have in fact been in custody for only four and a half hours. This would make any challenge to the waiver all the more remote. Regardless, Hammadi has provided nothing to support this novel theory.

Additionally, Earhart considered filing a motion to suppress but decided against doing so given the overwhelming evidence facing Hammadi. This is demonstrated by the following exchange from the evidentiary hearing:

> Q:   Now, there's also been an issue about that you didn't move
> to suppress Mr. Hammadi's statements. What was your reasoning

for not filing a motion to suppress the statements he made after his arrest?

A:     I didn't identify any basis upon which to suppress them, nor did I believe they were going to impact the resolution of the case.

Q:     Why is it that you didn't think they would impact the resolution of the case?

A:     Because the Government's case was based on audio recordings of the events, video recordings of the events, the presence of FBI agents at the events, and the co-defendant going to testify.  Frankly, what Mr. Hammadi said in light of that is almost irrelevant, especially in — I didn't see that it would have any impact whatsoever.

Q:     Now —

A:     I guess the fourth reason is nor did I see a basis to suppress it.

(DN 192 PageID # 1140-41).

Thus Earhart considered the motion, and reasonably decided not to file.  As he mentioned, anything Hammadi said after his arrest carries little significance when compared with the audio and video proof of his actions.  Even if Earhart had somehow convinced the Court to suppress this testimony, which is unlikely, the effect of the suppression would have been nearly nonexistent had the case gone to trial.  Earhart's performance was therefore not deficient in this regard.

Having considered Earhart's performance as it relates to Hammadi's claims in Argument II, the undersigned now addresses the prejudice prong of the Strickland analysis.  As noted above, the key inquiry here is whether, absent Earhart's errors, there exists a "reasonable probability" that "the result of the proceeding would have been different."  Strickland 466 U.S. at

24

694.  This requires a showing that, absent Earhart's alleged errors, a jury would have had serious questions about whether Hammadi could be found guilty beyond a reasonable doubt. Id. at 695.

Hammadi can demonstrate no prejudice.  The undersigned has determined that Earhart's performance was not deficient, rendering this portion of the analysis technically unnecessary. Strickland 466 U.S. at 697.  Regardless, Earhart's decision not to call FBI agents, Alwan, and other alleged character witnesses had no impact on the guilty or voluntary nature of Hammadi's guilty plea.  Moreover, Hammadi has failed to show how, even had Earhart interviewed these witnesses himself, it would have affected his decision and made him more likely to go to trial. See Hill, 474 U.S. at 59.  Thus, Hammadi has not demonstrated prejudice with regard to this issue.  Additionally, as discussed above, Hammadi cannot demonstrate prejudice as a result of Earhart's decision not to file a motion to suppress.  The body of evidence confronting Hammadi was so substantial as to render his post-arrest comments nearly irrelevant to a successful prosecution.  Therefore, Hammadi cannot demonstrate prejudice with regard to any of the claims thus far discussed in Argument II, and it is recommended that these claims be denied.

## 2.

The next portion of Argument II concerns Hammadi's claims that Earhart was ineffective for failing to object to a multiplicitous indictment and for failing to object to various issues under the Sentencing Guidelines.

As for multiplicity, Hammadi argues his indictment was multiplicitous because Counts 2, 4, 6, and 8 allege a violation of 18 U.S.C. § 2339A and Counts 3, 5, 7, and 9 allege a violation of 18 U.S.C. § 2339B (DN 148 PageID # 860-61).  Moreover, Hammadi contends Count 10, a violation of 18 U.S.C. § 2332(g), charges Hammadi with the same conduct as Counts 4 and 5.

25

Generally, "'[m]ultiplicity' is charging a single offense in more than one count in an indictment."  United States v. Swafford, 512 F.3d 833, 844 (6th Cir. 2008) (quoting United States v. Lemons, 941 F.2d 309, 317 (5th Cir. 1991)).  Using a single course of conduct to prove separate elements of multiple crimes does not violate the double jeopardy clause.  See Id.  "[T]he general test for compliance with the double jeopardy clause looks to whether each provision requires proof of a fact which the other does not."  Id. (quoting United States v. Davis, 306 F.3d 396, 417 (6th Cir. 2002) (internal quotations omitted)).  In other words, a reviewing court must examine the charged offenses and determine whether each requires proof of an element that the others do not.

Here, Hammadi has offered little in the way of analysis of the elements of the charged offenses.  But a cursory review of the language of the challenged statutes plainly demonstrates that each contains independent elements from the rest.  First, 18 U.S.C. § 2239A provides in relevant part as follows:

> Whoever provides material support or resources . . . knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section . . . 1114, . . . 2332, 2332a, . . . or attempts . . . to do such an act, shall be fined under this title, imprisoned not more than 15 years, or both.

Second, 18 U.S.C. § 2339B, in relevant part, provides as follows"

> Whoever knowingly  provides material support or resources to a foreign terrorist  organization, or attempts . . . to do so, shall be fined under  this title or imprisoned not more than 20 years, or both.

Finally, 18 U.S.C. § 2332g provides as follows:

> [I]t shall be unlawful for any person to knowingly . . . transfer directly or indirectly, receive, possess, . . . export, . . .—
>
> (A) an explosive or incendiary rocket or missile that is guided by any system designed to enable the rocket or missile to—
>
> (i) seek or proceed toward energy radiated or reflected from an aircraft or toward an image locating an aircraft; or
>
> (ii) otherwise direct or guide the rocket or missile to an aircraft;
>
> Any person who violates, or attempts or conspires to violate, subsection (a) shall be fined not more than $2,000,000 and shall be sentenced to a term of imprisonment not less than 25 years or to imprisonment for life.

The independent elements are obvious. Section 2339B, for one, differs from 2339A by adding the element of a foreign terrorist organization. Section 2339A contains an independent element requiring the offender to have committed his violation in furtherance of one of a number of other statutory violations. Finally, § 3223g requires the transfer or possession of a specific class of weapon not mentioned in either of the other statutes. And, § 2332g does not possess either the element of committing acts in furtherance of certain enumerated statutes or the element of supporting a foreign terrorist organization. Because each statute contains independent elements from the others, Hammadi cannot show that the indictment was multiplicitous and cannot demonstrate that Earhart was ineffective for failing to object on these grounds. Therefore, it is recommended that this claim be denied.

Moreover, Hammadi argues Earhart was ineffective for failing to make certain objections based on the calculations under the Sentencing Guidelines. Specifically, Hammadi notes that a letter from the United States during plea negotiations that included an offense level calculation under USSG § 2A1.1 (DN 194 PageID # 1222). But Hammadi claims the presentence report

performed a calculation under 2K2.1 (Id.).  Hammadi does not explain why the presentence calculation was improper, nor does he offer any reason why the alternative calculation prejudiced him.  The undersigned concludes that Hammadi has failed to demonstrate either defective performance or prejudice.  Therefore, it is recommended that this claim be denied.

Hammadi further argues Earhart was ineffective for failing to object to the guideline increase for the specific offense characteristic that Hammadi "possessed all of the weapons involved in this case with the knowledge that they would be transported out of the United States for the purpose of injuring and/or killing American soldiers" (DN 104 PageID # 521).  Hammadi contends this enhancement provision, located at USSG § 2K2.1(b)(6), was not in effect until November 11, subsequent to Hammadi's charged conduct (DN 194 PageID # 1222, DN 194 PageID # 862-63).

This claim is without merit.  While the exact language of 2K2.1(b)(6) did not go into effect until November of 2011, the prior version of the Guidelines contained a similar provision that would have resulted in the same outcome.  Specifically, the prior version recommended a sentence enhancement if the defendant "possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe it would be used or  possessed in connection with another felony offense . . ."  USSG § 2K2.1(b)(6) (Nov. 1, 2010 Manual).  The amended version maintained this language word for word, but 2K2.1(b)(6) was subdivided into subsections (A) and (B).  The relevant portion, quoted above, remains at USSG § 2K2.1(b)(6)(B) (Nov. 1 2011 manual).  The 2011 version added a subsection (A) which provides for an alternative sentence enhancement where the defendant knew or had reason to know the firearms would be transported out of the United States.  USSG § 2K2.1(b)(6)(A).

There is no reason to believe Hammadi's sentence would not have qualified for the enhancement as provided in the 2010 version. Any objection by Earhart would have resulted in the same enhancement, no matter the publication date of the Sentencing Guidelines. Thus, the undersigned concludes that Earhart's failure to object on this matter is reasonable, and did not result in prejudice to Hammadi. Therefore, it is recommended that this claim be denied.

Next, Hammadi argues Earhart was ineffective for failing to move for a downward departure based on Hammadi's belief that he had a mitigating role in the activity (DN 148 PageID 861-62). Hammadi argues Alwan was much more involved in the criminal conduct than Hammadi. The Sentencing Guidelines provide for a reduction of two, three or four levels, depending on how minor or minimal the Court views a defendant's role to have been in the alleged conduct. USSG § 3B1.2.

Not every case involving multiple defendants requires a consideration of role adjustment. USSG Chapter 3, Part B (Introductory Comment). Here, while Alwan was involved before Hammadi and recruited him, both individuals were subsequently captured on camera committing the acts of which they are accused (*See* DN 104 PageID # 518-523). It therefore seems highly unlikely that any motion for a downward departure on these grounds would have been successful. And, even if Hammadi had received the maximum allowable four-level reduction, he would have nonetheless had forty-nine offense points, still well in excess of the forty-three required to reach the Guidelines' highest offense level. USSG Chapter 5, Part A, Comment (n2). Thus, while the undersigned finds that Earhart's actions were reasonable in this instance, even if they were not, Hammadi has not demonstrated actual prejudice. Therefore, it is recommended that this claim be denied.

29

Similarly, Hammadi argues that Earhart was ineffective for failing to object to the three level enhancement for targeting an official victim (DN 148 PageID # 863). Hammadi maintains the object of his crimes was the United States Government, in general, not specific officials. This argument is unconvincing, and Hammadi fails to support his contention either legally or factually. First, Hammadi did not target the government generally. Rather, he understood that the weapons he was helping ship to Iraq would be used against American soldiers (DN 104 PageID # 521). Moreover, even if Hammadi had successfully objected to this three-level enhancement, the resulting difference, even combined with the four-level role adjustment departure discussed and rejected above, would leave Hammadi with forty-six offense points, still well in excess of the highest sentencing level. Tso while the undersigned reiterates that Earhart's decision not to object to this enhancement was reasonable, Hammadi has nonetheless failed to satisfy the prejudice prong of the analysis. Therefore, it is recommended that this claim be denied.

Hammadi next offers the incredible argument that the missiles which he was attempting to transport should not be classified as missiles for purposes of his twelve level sentencing enhancement under USSG § 2K2.1(b)(3)(A) because they were inoperable at the time of his crime (DN 148 PageID 863-64). Yet again, Hammadi offers nothing in way of support for this contention. The Sentencing Guidelines are unequivocal on this point. For purposes of sentencing adjustments, an actor is deemed responsible for not only his acts or omissions, but also "all harm that was the object of such acts and omissions[.]" USSG § 1B1.3(a)(3). The object of Hammadi's acts was to assist in the shipment of missiles to Iraq. Whether or not the

missiles were functional is irrelevant.  Therefore, Hammadi has failed to demonstrate deficient performance or prejudice, and it is recommended that this claim be denied.

<u>3.</u>

Hammadi concludes Argument II with an array of objections related to Earhart's handling of discovery.

Hammadi contends that Earhart was ineffective for failing to have an interpreter present when discussing aspects of this case with Hammadi (DN 194 PageID # 1223).  Hammadi further contends that Earhart was ineffective for failing to provide a laptop so that Hammadi could review audio and video discovery materials (<u>Id.</u> at 1223-24).  Further, Hammadi complains that, while he was given a large amount of discovery documents, many of them were in English, and he therefore could not understand them (<u>Id.</u>).  But this notion that Hammadi cannot understand English is a new development and supported only by Hammadi's word.  Earhart testified at the evidentiary hearing that Hammadi spoke English well, and neither ever had difficulty speaking to or understanding one another (DN 192 PageID # 1108-09).  Moreover, Hammadi acknowledged when he entered his plea of guilty that he had an ample opportunity to discuss the case with his attorney and that he was fully satisfied with the advice Earhart had given him (DN 125 PageID # 722).  Further, Hammadi offers no specific instances of exculpatory evidence that he could not access or how, even assuming Hammadi could not understand some of the discovery materials, how it would have affected his decision to plead guilty.  Thus, Hammadi has failed to demonstrate either deficient performance or prejudice, and it is recommended that this claim be denied.

Hammadi next argues that Earhart was ineffective because he did not subpoena the telephone records of Amir Dida (DN 194 PageID # 1224-25).  Hammadi alleges that the government placed Dida into Hammadi's jail cell (Id.).  Hammadi claims Dida pressured him to fire Earhart and cooperate with the government (Id.).  The United States denies that Dida was a plant (DN 201 PageID # 1279).  The undersigned will not speculate on whether Amir Dida was planted by the government.  Hammadi has provided no evidence to back up this contention. Presumably, Hammadi could have subpoenaed the telephone records he claims Earhart was constitutionally deficient for failing to subpoena.  Hammadi could have entered those into evidence and questioned Earhart about them at the hearing.  The fact that Hammadi has not done so leads the undersigned to conclude that this claim is lacking in merit.  And, even assuming for the sake of argument Dida was planted by the government, Hammadi offers no evidence how this affected his decision to plead guilty.  In other words, Hammadi has again failed to demonstrate deficient performance or prejudice, and it is recommended that this claim be denied.

<u>4.</u>

The only remaining question with regard to Argument II is whether a Certificate of Appealability should issue as to these claims.  Where, as here, a Court has dismissed a claim or claims on the merits, a Certificate of Appealability should only issue if "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." <u>Slack</u>, 529 U.S. at 484.  It is clear in this instance that Earhart's performance did not constitute constitutionally deficient representation in any of the instances discussed above.  Moreover, Hammadi has failed to demonstrate prejudice.  Therefore, the undersigned recommends a Certificate of Appealability be denied as to Argument II.

## C. ARGUMENT III

In Argument III, Hammadi challenges Earhart's performance following sentencing.  First, Hammadi claims Earhart was ineffective because he advised Hammadi to plead guilty without a plea agreement, and in so doing waived Hammadi's substantive defenses on appeal.  The undersigned largely addressed this issue above when discussing Earhart's alleged ineffectiveness in plea negotiations.  Hammadi appears to be attempting a second bite at the apple by bringing up the issue again in the context of Earhart's performance on appeal.  One new issue, however, is Hammadi's claim that Earhart was ineffective for not pursuing on appeal a motion filed originally by Alwan and joined by Hammadi that challenged the government's use of search warrants (DN 194 PageID # 1226).

The two-prong test from Strickland applies when assessing counsel's performance on appeal.  Smith v. Murray, 477 U.S. 527, 535 (1986).  Counsel need not raise every non-frivolous issue on appeal.  Jones v. Barnes, 463 U.S. 745, 751 (1983).  It is difficult for a defendant to demonstrate that counsel was incompetent, and to do so, the defendant must show that the issue counsel did not raise on appeal is "clearly stronger" than those presented.  Smith v. Robbins, 528 U.S. 259, 288 (2000).

Here, apart from mentioning the motion concerning search warrants, Hammadi has done nothing to advance an argument that the issue was clearly stronger than those raised by Earhart.  The motion in question concerned the suppression of certain evidence gathered under the Foreign Intelligence Surveillance Act (DN 22, DN 39).  But the undersigned cannot ascertain what exactly Hammadi is contending Earhart should have argued.  Moreover, as noted above, Hammadi's entering into a plea agreement waived any non-jurisdictional attacks on the

conviction.  Corp, 668 F.3d at 384.  In essence, Hammadi is contending Earhart was ineffective for failing to address an issue on appeal that was unavailable to Earhart on appeal.  This argument is circular and must fail.  Earhart had very few options following sentencing, and his performance was competent in light of the choices available to him.  Finally, Hammadi also makes no argument that Earhart's failure to include the search warrants issue resulted in prejudice.  The undersigned therefore concludes that Hammadi has not demonstrated that Earhart was ineffective with regard to this issue, and it is recommended that this claim be denied.

Hammadi next argues that Earhart was ineffective for failing to file a petition for writ of certiorari in the Supreme Court of the United States (DN 194 PageID # 1226-27).  But the Sixth Circuit Court of Appeals has expressly held that a defendant has no Sixth Amendment right to the assistance of counsel in filing a petition for writ of *certiorari*.  Nichols v. United States, 563 F.3d 240, 242 (6th Cir. 2009) (citing Ross v. Moffitt, 417 U.S. 600, 617 (1974).  "[W]here there is no constitutional right to counsel there can be no deprivation of effective assistance[.]"  Coleman v. Thompson, 501 U.S. 722, 752 (1991).  The undersigned therefore concludes that Earhart was not ineffective, and it is recommended that this claim be denied.

Finally, Hammadi claims Earhart was ineffective for failing to continue to advise Hammadi to cooperate with the government in hopes of securing a reduction in sentence based on a Rule 35 motion. (DN 194 PageID # 1227).  This claim is based solely on Earhart's performance after sentencing, but does not relate to the direct appeal issues discussed above.  Hammadi does not cite any authority to support this proposition.  The United States responds that this issue is time barred because Hammadi did not assert it in his original motion (DN 201 PageID # 1281-82).

As a procedural matter, this claim is time barred, though not for the reasons offered by the United States.  With regard to motions filed under 28 U.S.C. § 2255, "[t]he Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure, to the extent that they are not inconsistent with any statutory provisions or these rules, may be applied to a proceeding under these rules."  Rules Governing Section 2255 Proceedings for the United States District Courts Rule 12; *See Also*, Fed. R. Civ. P. 81(2)(a) (Civil Rules "are applicable to proceedings for . . . habeas corpus").  Therefore, a simple application of the statute of limitations is not the end of the inquiry.  The issue now becomes whether this claim would relate back to the original complaint under Rule 15(c)(2) of the Federal Rules of Civil Procedure.

"Rule 15(c)(2) relaxes, but does not obliterate, the statute of limitations; hence relation back depends on the existence of a common core of operative facts uniting the original and newly asserted claims."  Mayle v. Felix, 545 U.S. 644, 659 (2005) (internal quotations omitted).  Habeas petitioners may not assert that a claim subsequent to the original complaint relates back by virtue of the simple fact that the claim is related to the proceedings giving rise to the challenged conviction.  Id. at 656.  Such a capacious definition of the term "conduct, transaction, or occurrence" would permit a habeas petitioner to assert nearly any claim at any point in the proceedings and have it relate back.  Id. at 656-57.

In Mayle, the Court suggests that the primary consideration in determining whether a newly asserted claim relates back should be the event giving rise to the claim.  Id. at 647.  Mayle, the petitioner, attempted to offer a newly asserted Fifth Amendment challenge to a videotaped police interrogation.  Id.  Mayle argued that the claim did not ripen until the evidence was admitted at trial, and as such, the claim should be considered related to his other challenges to

35

the trial process.  But the Court held that the event giving rise to the claim was the videotaped interrogation itself, an extrajudicial occurrence unrelated to the trial process.  Thus, Mayle's claim could not relate back because it was his first attempt to challenge the interrogation, which the Court reasoned was a discrete event.  Id.

In the instant case, the event giving rise to the challenged conduct is Earhart's post-conviction representation of Hammadi, specifically Earhart's failure to advise Hammadi to continue cooperating with the United States in hopes of obtaining a Rule 35 motion.  While Hammadi's original petition challenged Earhart's representation on direct appeal (DN 148 PageID # 864-65), the issue of continued cooperation with the United States is a discrete event, unrelated to Earhart's performance before the Sixth Circuit.  The undersigned therefore concludes that this claim is time barred.  Moreover, the undersigned notes that, even if the claim does relate back, Hammadi has provided no supporting authority for this claim, and the undersigned has located none.  Thus, regardless of the procedural bar, the issue is without merit. It is therefore recommended that this claim be denied.

The only remaining question with regard to Argument III is whether a Certificate of Appealability should issue as to these claims.  Where, as here, a Court has dismissed a claim or claims on the merits, a Certificate of Appealability should only issue if "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack, 529 U.S. at 484.  It is clear in this instance that Earhart's performance did not constitute constitutionally deficient representation in any of the instances discussed above.  Moreover, Hammadi has failed to demonstrate prejudice.  Therefore, the undersigned recommends a Certificate of Appealability be denied as to Argument II.

RECOMMENDATION

For the forgoing reasons, it is recommended that Hammadi's petition for relief under 28 U.S.C. § 2255 as well as Hammadi's supplemental petition (DN 194) be dismissed.

NOTICE

Under the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C) and Fed.R.Civ.P. 72(b)(1), the undersigned magistrate judge files these findings and recommendations with the Court and a copy shall forthwith be electronically transmitted or mailed to all parties. Within fourteen (14) days after being served with a copy, any party may serve and file written objections to such findings and recommendations as provided by the Court. 28 U.S.C. § 636(b)(1)(C); Fed.R.Civ.P. 72(b)(2) If a party has objections, such objections must be timely filed or further appeal is waived. Thomas v. Arn, 728 F.2d 813 (6th Cir.), aff'd, 474 U.S. 140 (1984).

Copies:       Mohanad Shareef Hammadi

              Counsel

37